UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

**TRUSTEES OF THE PAINTERS UNION
DEPOSIT FUND,**

    Plaintiff,

vs                                                Case No: 05-70110
                                                Honorable Victoria A. Roberts

**INTERIOR/EXTERIOR SPECIALISTS
COMPANY, ET AL,**

    Defendants,
_____/

## OPINION AND ORDER

**I.    INTRODUCTION**

This matter is before the Court on Defendants' Motion for Partial Summary Judgment (Doc. #86). For the following reasons, the Court **DENIES it in part and Grants it in part**.

**II.    BACKGROUND**

This is an action to collect fringe benefit contributions and liquidated damages for late payments allegedly owed by Defendants, Interior/Exterior Specialist Co. ("IES") and The Llamas Group, Corp. ("TLG"). IES entered into a collective bargaining agreement ("CBA") with Painters District Council No. 22 of the International Brotherhood of Painters and Allied Trades, AFL-CIO ("the Union"), dated October 5, 1998. Plaintiff alleges that TLG, owned and operated by Julie Llamas, wife of Rito Llamas, is the alter ego of Defendant IES and is liable for payments under the CBA. Plaintiff also alleges that Rito Llamas ("Rito") is liable as a personal guarantor under the CBA.

IES is a minority owned and controlled Michigan corporation with a predominately Hispanic workforce. Incorporated since 1997, IES provides painting services and selective demolition. Rito is the sole shareholder and director of IES.

Defendant TLG was incorporated in 1999. It is a nonunion general contracting firm whose work includes design, building, concrete work, masonry work, and some painting. Julie Llamas is the president and sole shareholder of TLG. TLG and IES share the same principal place of business at 7343 Allen Road, Allen Park, Michigan. They also share office and warehouse space in the same building. Rito and Julie Llamas together own the building in which IES and TLG operate. TLG pays monthly rent. The record is unclear as to whether the rent payments are paid to Rito and Julie Llamas or the deed holder of the property. Occasionally, both companies share employees when work is low. Rito and Julie Llamas together maintain the IES check register. Julie Llamas has permission to withdraw cash and write checks from an IES account. Rito Llamas also sometimes writes and signs checks for TLG. They have different phone numbers. Each company informally loans the other monies. IES and TLG do not share common equipment, and neither IES nor TLG uses the other's equipment.

As a union shop, IES is required by the terms of CBA to make regular employee fringe-benefit contributions to the trust maintained by the Trustees of the Painters Union Deposit Fund ("Plaintiff" or "Trustee"). These contributions are calculated based on the hours worked by IES employees.

IES and TLG dispute they owe money under the CBA. The CBA expired on May 31, 2003. By agreement of the parties, the contract was extended for one year, until

May 31, 2004. For termination, the CBA required at least 60 days notice prior to the anniversary date of the extension. On August 21, 2003, the Union filed a Charge Against Employer with the National Labor Relations Board against "Interior/Exterior Specialist d/b/a Llamas Group." (The "2003 Charge")  The Union claimed that for six months IES and TLG operated as an illegal double-breasted operation, and failed to pay members union wages and fringe benefits under the CBA.

In February of 2004, the Trustee filed suit alleging that IES violated "a contract between an employer and labor organization representing employees in an industry affecting interstate commerce." The Trustee also sought to compel a comprehensive audit of IES's books and records, claiming that IES was indebted to it for fringe benefit contributions and liquidated damages.

On March 23, 2004, IES notified the Union that it would no longer be a party to the CBA effective May 31, 2004. IES asserts this is the date on which the CBA terminated. The Union and the Trustee both argue that the CBA did not terminate.

On May 21, 2004, TLG, IES, and the Union entered into a settlement agreement concerning the 2003 Charge. As a condition of the settlement agreement, TLG agreed that it "[would] no longer serve as a painting contractor and [would] subcontract any painting work it might acquire to either Interior Exterior Specialists or to a contract[or] that has a labor contract with [the Union]." The Union agreed to withdraw the pending unfair labor practice charge and recommend that the Trustee dismiss its lawsuit. The Trustee agreed to dismiss the lawsuit and a dismissal without prejudice was entered on June 4, 2004.

On September 16 and 21, 2004, IES submitted two checks totaling $56,356.27 to

3

the Trustee for June and July fringe benefits. Simultaneously, on September 16, 2004, Rito Llamas sent a letter to the Union stating that the June and July payments were submitted pursuant to the settlement agreement. Further, in his correspondence, Rito Llamas reiterated that the payments in "no way reflect a desire to continue a contract or to extend the contract per [the] letter dated March 23, 2004 and received by your office on March 24, 2004."

On December 14, 2004, the Trustee received grievance reports from IES employees complaining that IES failed to deduct vacation benefits in November 2004. Based on this, the Trustee ordered a comprehensive audit on all books and related records of IES from September 1, 2001 to the date of completion of the audit, pursuant to the CBA. On January 11, 2005, this lawsuit was filed.

The Trustee seeks: (1) a comprehensive audit; (2) to collect delinquent fringe benefits and liquidated damages; and, (3) a finding that the IES and TLG are illegal alter egos. Defendants filed a counter claim against the Trustee and included the Union as a third-party defendant. Defendants' filed separate motions for summary judgment against the Trustee and the Union. In this Motion, Defendants request the Court find that the CBA terminated on May 31, 2004 and that IES and TLG are not alter egos.

### III. STANDARD OF REVIEW

Under FED. R. CIV. P. 56(c), summary judgment may be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Copeland v. Machulis*, 57 F.3d 476, 478 (6th Cir. 1995). A fact is "material" and precludes a grant of summary

judgment if "proof of that fact would have [the] effect of establishing or refuting one of the essential elements of the cause of action or defense asserted by the parties, and would necessarily affect application of appropriate principle[s] of law to the rights and obligations of the parties." *Kendall v. Hoover Co.*, 751 F.2d 171, 174 (6th Cir. 1984). The court must view the evidence in the light most favorable to the nonmoving party and it must also draw all reasonable inferences in the nonmoving party's favor. *Cox v. Kentucky Dept. of Transp.*, 53 F.3d 146, 150 (6th Cir. 1995).

The moving party bears the initial burden of showing that there is no genuine issue of material fact. *Snyder v. AG Trucking Co.*, 57 F.3d 484, 488 (6th Cir. 1995). To meet this burden, the movant may rely on any of the evidentiary sources listed in Rule 56(c). *Cox*, 53 F.3d at 149. Alternatively, the movant may meet this burden by pointing out to the court that the nonmoving party, having had sufficient opportunity for discovery, has no evidence to support an essential element of his or her case, and on which that party will bear the burden of proof at trial. *Tolton v. American Biodyne, Inc.*, 48 F.3d 937 (6th Cir. 1995); *Street v. J.C. Bradford & Co.*, 886 F.2d 1472 (6th Cir. 1989). The moving party does not, however, have to support its motion for summary judgment with evidence negating its opponent's claims. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1985).

Once the moving party has met its burden, the burden shifts to the nonmoving party to produce evidence of a genuine issue of material fact. Rule 56(e); *Cox*, 53 F.3d at 150. The nonmoving party cannot rest on its pleadings, but must present significant probative evidence in support of its complaint. *Copeland*, 57 F.3d at 479. The mere existence of a scintilla of evidence to support the nonmoving party position will be

insufficient; there must be evidence on which a jury could reasonably find for the nonmoving party. *Snyder*, 57 F.3d at 488; *Tolton*, 48 F.3d at 941.

## IV. APPLICABLE LAW AND ANALYSIS

### A. Summary Judgment Is Not Appropriate As To Whether IES and TLG are Alter Egos

"The alter ego doctrine is most commonly used in labor cases to bind a new employer that continues the operations of an old employer in those cases where the new employer is 'merely a disguised continuance of the old employer.'" *NLRB v. Fullerton Transfer & Storage Ltd., Inc.*, 910 F.2d 331, 336 (6th Cir. 1990). The Sixth Circuit suggested in dicta that the alter ego doctrine might also be "applied to so-called double breasted operations to determine whether two or more coexisting employers performing the same work are in fact one business, separated only in form." *Id.* at 336 & n.7 (hypothesizing that the doctrine might be equally applicable "where a company operating a unionized work force establishes a second nonunionized company performing the same work in the same market under the same control").

To determine alter ego status, courts ask "whether the two enterprises have substantially identical management, business, purpose, operation, equipment, customers, supervision and ownership." *Id.* "No factor is controlling and all need not be present." *NLRB v. Allcoast Transfer, Inc.*, 780 F.2d 576, 579 (6th Cir. 1986). The analysis is "flexible" and "no element should become a prerequisite to imposition of alter ego status; rather, all the relevant factors must be considered together." *Id.* at 582; *see also Yolton v. El Paso Tennessee Pipeline Co.*, 435 F.3d 571 (6th Cir. 2006).

The Trustee alleges that IES created TLG in order to capitalize on union contract

6

opportunities while simulatenouesly evading the collective bargaining obligations faced by the other union employers. In support of its alter ego claim, Plaintiff provides affidavits, deposition testimony, and documentary evidence. The evidence presented to the Court indicates that IES and TLG share the same employees and operate out of the same building; that Rito and Julie Llamas own that building; the companies advance money to each other based on verbal agreements; that Julie Llamas is involved in the financial management of IES; that Rito Llamas is involved in the financial management of TLG; that the finances of both companies are substantially intertwined; and, that both IES and TLG are involved in painting work. Further, Plaintiff presents grievance reports and testimony from three employees who allege that fringe benefits were deducted from their paychecks but never paid to the Trustee.

Defendants' argue that as a matter of law TLG cannot be the alter ego of IES. Relying on two recent opinions, Defendants assert that there is no evidence that TLG was formed or operated with the intended purpose to evade preexisting contractual obligations with the Union. *See Trustees of the Resilient Floor Decorators Ins. Fund v. A & M Installations, Inc.*, 395 F.3d 244 (6th Cir. 2005); *Cement Mason's Pension Trust-Fund, Detroit & Vicinity v. McCarthy*, 2006 WL 770444 at *5 (E.D. Mich. 2006). Further, Defendants contend that there is no evidence that IES subcontracted TLG to do IES's work in order to avoid its obligations under the CBA. In addition, Defendants argue that while IES was a signatory to the CBA, it paid over $718,166.55 to Plaintiff and there is no evidence that Plaintiff received less than the full benefits it was entitled to receive.

In short, Defendants contend that their actions do not give rise to alter ego

status. In support, Defendants rely on *Trustees of the Resilient Floor Decorators Ins. Fund v. A & M Installations, Inc.;* and *Cement Mason's Pension Trust-Fund, Detroit & Vicinity v. McCarthy* ("McCarthy").

The *Resilient Floor Decorators* case, unlike this action, involved a nonunion company, Carpet Workroom and a later formed union company, A &M Installations. Carpet Workroom, sold carpet and flooring to commercial customers. John Lukasik founded the company in 1982. His brother-in-law was an employee from 1986 until he left the company in 2001 to devote his attention to A & M Installations, a unionized carpet and flooring installation company. Because Carpet Workroom often bid for sale of carpet on union projects, it frequently would subcontract its installation work to the unionized A&M. *Trustees of the Resilient Floor Decorators Ins. Fund,* 395 F.3d at 247.

Carpet Workroom and A & M - in addition to common projects and customers - shared office and warehouse space in the same building. *Id.* And, because of the physical proximity of the two companies' operations, they shared office equipment and personnel as well. Given this, Resilient Floor Decorators Union Trust funds argued that A & M and Carpet Workroom were alter egos of one another and that Carpet Workroom should be bound by the terms of the collective bargaining agreement signed by A & M, and should be required to make contributions to the union trust funds based on the number of hours worked by Carpet Workroom employees. *Id.* at 248.

The Sixth Circuit was not persuaded. The Court stated that "Resilient Floor disregards the fact that 'an intent to evade' preexisting obligations is clearly the focus of the alter ego doctrine." *Id.* In holding that no alter ego relationship existed the Court found that "in the absence of some indication that the relationship between the

8

companies has changed over the years or has caused the union to receive less than that for which it bargained, there is no inequity that would justify a court's imposition of liability." *Id. citing Mass. Carpenters Cent. Collection Agency*, 343 F.3d 18, 22 (1st Cir. 2003).

Similarly in *McCarthy*, the Court held that there was no evidence that the non-union company was formed due to an "intent to evade" preexisting contractual benefit obligations. *Cement Mason's Pension Trust-Fund, Detroit & Vicinity v. McCarthy*, 2006 WL 770444 at *5 (E.D. Mich. 2006). Citing *Resilient Floors*, the *McCarthy* Court found application of the alter ego doctrine would be inappropriate. *Id.* Notably, the companies in *McCarthy* had different: (1) ownership; (2) business purposes; (3) offices; (4) phone numbers; (5) officers; and (6) management -– and they did different work. *Id.* The two companies also maintained separate bank accounts and insurance policies, and they did not share common equipment. *Id.* Further, there was no evidence of intermingling of funds or assets. *Id.*

This case presents different facts than the above cited cases. Here, IES and TLG represent the inverse of *Resilient Floor and McCarthy*. TLG, a nonunion company, was incorporated in 1999 after IES signed the CBA. While Defendants argue that there is no evidence that TLG was formed due to an "intent to evade" preexisting contractual benefit obligations, a finding of intent is not essential or prerequisite to imposition of alter ego status. *NLRB v. Allcoast Transfer, Inc.*, 780 F.2d 576, 581 (6th Cir. 1986). Instead, it is merely one of the relevant factors which can be considered. *Id.*

"[A] determination of alter ego status is a question of fact . . . ," *id.*, and in this case Plaintiff has put forth sufficient evidence to demonstrate that there is a genuine

issue of material fact for the jury. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986). A review of the aforementioned alter ego factors demonstrates summary judgment should not be granted.

The ownership factor favors Defendants. The ownership interests of IES and TLG do not overlap. Rito Llamas owns IES and Julie Llamas owns TLG. In addition, Defendants offer evidence showing that the two companies do not have substantially identical business purposes, customers, equipment, or supervision. Defendant IES focuses on painting and demolition projects; TLG focuses on general contracting, design, building, concrete work, masonry work and some painting. This information suggests that even though there is some overlap, the companies have different businesses, purposes, and customers.

The operations factor, on the other hand, appears to weigh in Plaintiff's favor for four reasons: (1) Rito appears on the payroll of TLG and Julie appears on the payroll of IES; (2) the two companies allegedly commingle funds; share employees; and operate out of the same facility. As to the commingled funds issue, Rito and Julie Llamas both testified: that both parties maintain the IES check register; Julie Llamas has permission to withdraw cash from an IES account and has permission to write IES checks; Rito Llamas sometimes writes and signs checks for TLG; IES advances funds to TLG and TLG advances to IES; Julie Llamas is listed as an authorized signatory for the IES bank account and Rito Llamas is listed as an authorized signatory for the TLG bank account. *See* Pl. Ex. K; L; M; N.

Furthermore, the companies informally lend significant amounts of money to each other, without keeping close track of the loans in writing. *See* Pl. Ex. N. The two

companies do, however, have separate books and separate bank accounts. While this separation might tend to negate the conclusion that the companies commingled funds, a reasonable jury could find that the operations factor weighs in Plaintiff's favor.

The management factor favors Defendants. Rito manages IES and Julie manages TLG.

Finally, Defendants extensively argue that any claims of alter ego status are precluded by the 2003 settlement agreement with the Union, which discharged the Unions unfair labor practices charge. Defendants claim Plaintiff, a third-party beneficiary of the CBA, cannot bring claims that the Union is not entitled to bring. Even though the arguments raised by Defendant are not dispositive to the alter ego issue, the Court notes that Plaintiff is a separate entity from the Union. Plaintiff has separate rights to ensure the payment of contributions. Although Plaintiff's consent is needed for the settlement agreement to be binding, this does not make Plaintiff a party to the settlement. *See Bakery & Confectionary Union v. United Banking Co.*, 495 F.Supp. 170, 172 (W.D.Penn. 1980)(stating that "[s]ettlement agreements could not bind the trust fund without their consent, they are proper parties to bring this suit and there is nothing in the settlement agreement which makes it binding upon the funds . . .."). Therefore, Plaintiff is not bound by any agreement signed by the Union and Defendants.

Viewing the facts and drawing all inferences in a light most favorable to Plaintiff the Court concludes that genuine issues of material fact exist. Thus, the Court **DENIES** Defendants' IES and TLG's motion for partial summary judgment as to this issue.

In addition, given the controverted facts, the Court **DENIES** Plaintiff's request for

a Rule 56(d) finding of material facts related to the alter ego status.

### B. Summary Judgment Is Appropriate on the Issue of Whether IES Terminated the CBA Effective May 31, 2004.

Defendants request the Court to find that the CBA terminated effective May 31. 2004. Plaintiff argues that the CBA was not terminated in accordance with contract provisions.

Article XXIII of the CBA provides:

Section 1. The terms of this Agreement shall be from June 1, 1998 through May 31, 2003 and from year to year thereafter unless either party desires a change, in which case it is to notify the opposite party in writing at least sixty (60) days prior to May 31, 2003 or sixty (60) days prior to the anniversay date of the extension thereof.

IES and the Union agreed to a one year extension. Accordingly, IES was required to send written notice of termination to the Union on or before April 1, 2004. On March 23, 2004, IES sent such notification. The letter stated "This will serve as Interior Exterior Specialists' 60 day notice that we will not be renewing our contract with the Painters' Union. We submit this notice in accordance with the contract in a timely manner . . .." Def. Ex. E.

On September 16, 2004, IES submitted June and July 2004 fringe benefit payments to the Union. In a letter accompanying the payments, IES stated:

Please be advised the June and July 2004 payroll benefits are being submitted in accordance (sic) to our [settlement] Agreement dated May 21, 2004. These payments in no way reflect a desire to continue a contract or to extend the contract as per our letter dated March 23, 2004 and received by your office on March 24, 2004.

IES argues that its March 24, 2004 letter terminated the CBA. IES also claims that the June and July 2004 payments were made under protest and in response to coercion

from the Union. Further, IES contends that it entered a construction industry "me too" agreement under Section 8(f) of the National Labor Relations Act ("NLRA"), thereby requiring no more than a notice of intent not to renew by the terms of the agreement.

The Trustee contends IES's conduct subsequent to sending the March letter undermines any claim that the CBA was properly terminated. In addition to submitting the June and July 2004 payments, Plaintiff alleges IES also continued to benefit from additional optional insurance coverage and Plaintiff's payment of the fringe benefits to the employees. According to Plaintiff, these benefits are only available when the CBA is in force. The Trustee also contends that IES withheld vacation pay from its employees from August through November 2004, but then failed to remit the funds to the Trustee. Based on this, Plaintiff argues that IES acted and conducted itself as if the CBA remained in force after May 31, 2004. Plaintiff cited no authority for this position.

IES directs the Court's attention to the requirements for terminating an § 8(f) construction industry agreement in contrast to a standard § 9(a) collective bargaining agreement under the NLRA.[1] IES asserts that as a construction employer it entered an

---

[1] Third-Party Defendant Painters Union in its responses to IES's written discovery requests stated that the following was required to properly terminate a collective bargaining agreement with Local 22:

> To properly terminate a collective bargaining agreement with Painters District Council 22 a contractor must timely notify the union, the Michigan Employment Relations Commission and the Federal Mediation and Conciliation Service. The contract must also comply with the procedures set forth in the Interrogatory 7. If not, the new agreement negotiated by and between the union and the multi-employer association will have full application.

Def. Ex. Q. Painters Union response to Interrogatory 7 states:

> To withdraw from such a bargaining [multi-employer bargaining

8(f) "me too" agreement with the Union.[2] In contrast to multi-employer union collective-bargaining relationships governed by section 9 of the Act, construction employers who have an 8(f) relationship with a union, do not have an obligation to bargain for a successor contract. As such, IES contends that its' notice to the Union of an intent not to renew the contract was all that was required by the terms of the agreement and the NLRA.

Even if section 8(f) does not require IES to bargain for a successor contract, the dispositive questions here are: 1) whether proper notice of termination was given; and 2) whether an employer's intent to be bound by the provisions of a CBA may be inferred from the employer's conduct alone, despite its written notice of termination.

Under the Labor Management Relations Act, enforcement and interpretation of collective bargaining agreements is governed by traditional rules of contract interpretation so long as their application does not conflict with federal labor policy. *Armistead v. Vernitron Corp.*, 944 F.2d 1287, 1293 (6th Cir. 1991). When interpreting a

---

> arrangement], a contract must provide clear and unequivocal written notice of its desire to withdraw from multi-employer bargaining to both the union and the multi-employer association prior to contractually established date for modification of the collective bargaining agreement.

Def. Ex. Q.

[2] "Section 9(a) of the NLRA requires that a union be selected by a majority of the employees in a bargaining unit before the union has the right to represent the employees in collective bargaining. 29 U.S.C. § 159(a). Section 8(f), however, provides an exception for the building and construction industries. In these industries, an employer can enter into a 8(f) collective bargaining agreement with a union that is not supported by a majority of the unit employees. 29 U.S.C. § 158(f)." *Hovey Elec. Inc. v. NLRB*, 22 Fed.Appx. 509, 510 (6th Cir. 2001).

collective bargaining agreement, the Court looks at the specific language in the context of the entire agreement. *Id.*; *see also Cincinnati Typographical Union No. 3, Local 14519 v. Gannett Satellite Info. Network*, 17 F.3d 906, 909 (6th Cir. 1994). Further, it is well settled law that contractual obligations will not, in the ordinary course, survive beyond the expiration of a collective bargaining agreement. *Litton Fin. Printing Division v. National Labor Relations Board*, 501 U.S. 190, 207 (1991).

In determining whether proper termination notice was given, it has been held that, where a union and an employer were both signatories to an agreement where the termination clause specified that the agreement would remain in force until either the union or employer gave notice of an intent to terminate, the employer's sixty-day written notice of an intent to terminate was effective to terminate the employer's obligations under the agreement. *See Int'l Union, United Automobile, Aircraft & Agricultural Implement Workers of Am., UAW, AFL-CIO, et al v. Textron, Inc.*, et al, 359 F.2d 966 (6th Cir. 1966)(interpreting the termination provisions of a collective bargaining agreement and pension plan entered between the parties and holding that the company intended to terminate, and thought it did by submitting a sixty-day written notice).

Similarly, IES submitted written notice to terminate within the sixty-day time period prescribed by the CBA. The Court finds this notice sufficient. The Trustee, however, argues that IES's post March 23 conduct negates a finding that the agreement terminated.

The Sixth Circuit recognized "the existence of a labor contract 'does not depend on its reduction in writing; it can be shown by conduct manifesting an intention to abide by agreed-upon terms.'" *Int'l Bhd. of Boiler makers, Local 1603 v. Transue & Williams*

15

*Corp.*, 879 F.2d 138, 1392 (6th Cir. 1989). Thus, the parties to an expired collective bargaining agreement may demonstrate an intent to continue the contract, in whole or in part, while in negotiations for a new contract. *Luden's Inc. v. Local Union No.6 of the Bakery, Confectionary, & Tobacco Workers Int'l Union*, 28 F.3d 347, 354-55 (3d Cir. 1994).

This record is unclear as to whether IES and the Union were actually negotiating a new CBA. The Union submitted the Affidavit of Robert Kennedy, trustee of Painters Union Deposit Fund, attesting that he had several telephone conversations with Rito Llamas before and after he sent his March 23, 2004 termination letter. Mr. Kennedy attests that Rito Llamas told him several times, both before and after he sent the letter, that IES would be signing a new collective bargaining agreement with the Union. For purposes of this Motion, the Court must consider the Trustee's argument that IES extended the collective bargaining agreement both by continuing to make the contributions (June and July 2004 payments) that were required by the agreement and submitting reports to the contributions fund.

In a similar case, *Dugan v. R.J. Corman R.R. Co.*, 344 F.3d 662 (7th Cir. 2003), the Seventh Circuit held that an employer's subsequent contributions to pension funds after termination of the collective bargaining agreement, while the parties were attempting to negotiate a new one, did not constitute a continuation of the collective bargaining agreement. *Id.* at. 668-69. Just like *Corman*, IES continued to make contributions after the collective bargaining agreement expired. This is evidence, Plaintiff argues, that IES considered the agreement to still be in effect, despite its formal expiration. When presented with these same arguments, the *Corman* Court stated "it is

16

weak evidence, however - evidence the district judge was not required to credit - because Corman had made clear its unwillingness to continue its relationship with the union, and the funds were the offspring of that relationship." *Id.* at 668.

Likewise, IES made clear in its letter accompanying its June and July 2004 benefit payments that "these payments in no way reflect a desire to continue a contract or to extend the contract . . .." Further, IES contends that the contributions were paid under protest because Tommy Thomas of the Union threatened to take employees off a job if IES did not provided a check for the contributions. Def. Ex. F. It follows that the continued contributions may not even have been voluntary, and if they were involuntary they certainly were not an acknowledgment of a contractual obligation. Therefore, the Court finds that IES intended to terminate, and did terminate the CBA in accordance with the terms of the agreement.

Contrary to IES's suggestion, a finding that the contract terminated on May 31, 2004 does not mean that "the only remaining issue with respect to the fringe benefit audit will be how much of the overpayment to the Fund has to be returned to IES." The Trustee still has a claim for fringe benefits through May 31, 2004. There are genuine issues of material fact as to how much may be owed to Plaintiff. Plaintiff argues that IES deducted vacation benefits but failed to pay these to the Trustee or the employees. In support of this, Plaintiff submits pay check stubs from two former employees. Pl. Ex. I.

IES asserts that no deductions were taken from these checks. In fact, IES contend the entries on the pay stubs were merely accounting errors because every check stub that seemingly indicates a deduction for vacation benefits also contains a

17

corresponding credit for this benefit.  Thus, IES contends there is no outstanding delinquency and in fact, they overpaid Plaintiffs.

On the other hand, Plaintiff submits a comprehensive audit and an affidavit which state that the IES would owe $186,781.62 after termination of the CBA.  Pl. Ex. B; J. Given this, it is inappropriate for the Court to grant summary judgment on the amounts owing.

**V.    CONCLUSION**

The Court **DENIES** in part and **GRANTS** in part, Defendants Motion for Partial Summary Judgment.  The only finding made as a matter of law is that the CBA terminated May 31, 2004.  Trial will go forward on Plaintiff's alter ego claim and the amount owed.

**IT IS ORDERED**.

S/Victoria A. Roberts
Victoria A. Roberts
United States District Judge

Dated:  March 27, 2007

The undersigned certifies that a copy of this document was served on the attorneys of record by electronic means or U.S. Mail on March 27, 2007.

S/Linda Vertriest
Deputy Clerk

18