**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

**TRUSTEES OF THE PAINTERS UNION**
**DEPOSIT FUND,**

      **Plaintiff,**

**vs.**                                                    **Case No: 05-70110**
                                                          **Honorable Victoria A. Roberts**

**INTERIOR/EXTERIOR SPECIALISTS**
**COMPANY, ET AL,**

      **Defendants,**

_____/


**OPINION AND ORDER**

**I.      INTRODUCTION**

This matter is before the Court on Third-Party Defendant Painters District Council

No. 22's Motion for Summary Judgment (Doc. #83).  For the following reasons, the

Court **DENIES** it in part and **GRANTS** it in part.

**II.     BACKGROUND**

Please see the Court's Opinion and Order on Defendants' Motion for Partial

Summary Judgment for background facts and standard of review.

Defendants filed a five count counterclaim against Plaintiff and Painters District

Council No. 22 of the International Brotherhood of Painters and Allied Trades, AFL-CIO

("Union") as a third-party defendant.  Defendants claim that the Union: 1) defamed

Defendants; 2) tortiously interfered with their contracts, business relationships, and/or

expectancies; 3) breached their express or implied settlement agreement by not

1

refunding or returning fringe-benefit payments to IES and TLG; 4) discriminated against IES and treated IES in a disparate manner; and 5) violated anti-trust laws by unreasonably restraining trade in the construction market.

**A.    Events Giving Rise to the Matter at Hand**

Defendants allege the following in support of their defamation and tortious interference claim against the Union:

1.    In September 2004, the Union threatened to shut down a project Defendants were working on at Patrick Henry Middle School in Woodhaven, MI.  Def. Ex. Q.

2.    The Union stated to representatives of Patrick Henry that Defendant IES failed to make benefit contributions.  *Id.*

3.    In December 2004, the Union allegedly "shut down" work at Western Michigan University ("WMU").  IES claims that Union agent Tommy Thomas stated to representatives of WMU that IES was a "bad" contractor and did not pay fringe benefits.  Def. Ex. Q.  It is further alleged that the Union threatened IES's nonunion workers and forced them to the leave the job.

4.    The Union interfered with TLG's business relationships.  In the summer of 2003, the Union allegedly created havoc at Wayne State University, where TLG was painting a garage.  TLG claims that the Union represented to Wayne State personnel that TLG was only paying its workers $10.00 per hour, which was well below the prevailing wage.  Def. Ex. T.  In addition, TLG claims that the Union threw its workers' supplies and materials in

2

dumpsters.

5.    Since this incident, TLG claims Wayne State refused to provide additional

work or accept phone calls from TLG.

As to their discrimination claim, Defendants primarily allege that the Union

disparately treated IES and TLG because their work force is of Hispanic national origin.

In support of this claim, Defendants state:

1.    The Union allows other nonminority companies to "move in and out" of the

Union.  Specifically, Mr. Thomas testified that "someone" above him

permitted contractors to move in and out of the union at-will, while the

Union looked the other way.  Def. Ex. S.

2.    George Lancaster testified that the Union was aware he setup a nonunion

company in his wife's name, but never questioned him about this entity.

Def. Ex. Z.

3.    The Union showed favoritism and disparate treatment to nonminority

companies by allowing them to engage in improper conduct without

investigating.  To cite one example, Defendants allege that Duross

Painting, a union company, is subcontracting painting work to Duross

Maintenance, a nonunion company.  Defendants attach sample checks as

evidence that the companies are intertwined.  Def. Ex. V, W, X.

Defendants note that the Union never audited the Duross companies.

4.    Despite IES's complaints of other union companies engaging in bid

rigging, Union agent, Mr. Thomas, testified that he failed to investigate any

of these claims.  Def. Ex. S, Y.

3

5.      The Union made it difficult for IES to withdraw from the collective
        bargaining agreement, while allowing other companies to do so easily.
        Mr. Madias, the owner of several union companies, testified that he
        withdrew his company by simply refusing to sign another union contract.
        Def. Ex. CC.

Finally, IES states that it persistently requested educational materials written in
Spanish for IES's apprentice painters.  Defendants claim that the Union never provided
the materials but did, however, issue "informational materials" in Spanish.  According to
IES, these materials were intended to incite Spanish speaking workers into harassing
contractors such as IES and TLG.  Mr. Thomas testified that he developed the Spanish
speaking materials to show the workers that there was an alternative to the wages they
were receiving in the nonunion field.  Def. Ex. S.

On the breach of contract and antitrust claims, Defendants rely and reference the
same allegations.  The Union's counter statement of facts references Rito Llamas's
deposition transcript and provides substantive counter arguments to the above
allegations.  The Court will address the deposition testimony as it pertains to each
counterclaim.  *See* Union Ex. A.

## IV.    APPLICABLE LAW AND ANALYSIS

### A.    Whether Defendants Breach of Contract, Tortious Interference, and Discrimination Claims Are Subject to Arbitration

Although the Union approaches this issue from several angles, in substance it
seems to request this Court to compel Defendants to arbitration.  The Union argues that
Defendants' breach of contract/restitution and discrimination counts allege violations of

4

the collective bargaining agreement ("CBA").  Article XX of the CBA contains a detailed procedure for resolving such disputes.[1]  The CBA requires an employer to appeal any grievances to the American Arbitration Association.  Citing section 203(d) of the Labor Management Relations Act and the Supreme Court, the Union asserts that federal labor policy requires Defendants to use the grievance/arbitration procedure.[2]  To support this argument, the Union says that Rito Llamas filed various grievances regarding the Union's alleged disparate treatment but never pursued arbitration.  Rito Llamas's stated reason for not seeking arbitration was that he believed the arbitrators would not fairly adjudicate his claim.  *See* Union Ex. A.

Defendants argue that they should not be required to submit their claims to arbitration.  They note that the Union waited nearly a year and half, after answering the complaint, conducting discovery, and filing and contesting several motions before raising the issue of arbitration.  Further, Defendants argue that even if their claims were subject to arbitration, the Union waived its right to invoke the arbitration process by failing to timely demand arbitration.

"Whether a dispute is arbitrable is a question for the Court to determine upon examination of the contract."  *Cincinnati Bengals, Inc. v. Thompson*, 553 F.Supp. 1011 (S.D.Ohio. 1983).  Usually, the Court must determine that there is a valid agreement to

---

[1]Article XX states in pertinent part: "whenever a dispute arises between the Union and an employer concerning the carrying out of this Agreement . . . the procedure set forth in the balance of this Article XX shall be followed."

[2]Section 203(d) of the Labor Management Relations Act provides:
> Final adjustment by a method agreed upon by the parties is declared to be the desirable method for settlement of grievance disputes arising over the application or interpretation of an existing collective-bargaining agreement.

29 U.S.C. § 173(d).

arbitrate.  Defendants do not dispute the validity of the arbitration provision of the CBA is valid.  Nor do Defendants argue that the CBA was not in effect when the claims arose.

Since there is no dispute that a valid agreement to arbitrate exists, the Court must consider whether the dispute is arbitrable.  *John Wiley & Sons v. Livingston*, 376 U.S. 543, 547 (1964).

### 1.    Arbitrability of the Dispute[3]

The Union points out that the crux of Defendants' allegations is that the Union engaged in disparate treatment by not enforcing the terms of the Painters Articles of Agreement[4] against other signatories, thereby breaching the CBA.  Whether IES is bound to arbitrate its claims is a question of contract interpretation.

The Court has found as a matter of law that the CBA expired on May 31, 2004. *See* Court's Opinion and Order on Defendants' Motion for Partial Summary Judgment. The National Labor Relations Board has held that an arbitration clause generally does not continue in effect after the expiration of a collective bargaining agreement.  *See Hilton-Davis Chem. Co.*, 185 N.L.R.B. 241, 242 (1970).  The NLRB's holding was subsequently adopted by the Supreme Court.  *See Litton Fin. Printing Div. v. NLRB*, 501 U.S. 190, 200 (1991).

Resolution of this issue is controlled by the Supreme Court's holding in *Litton*. In *Litton*, the Supreme Court articulated the following test to determine whether

---

[3]The parties only address whether a valid agreement to arbitrate exists and do not raise or address whether the dispute is arbitrable.

[4]The Court is unclear whether this is a part of the CBA or a separate agreement entered into by the parties.

grievances filed after a CBA expired are subject to arbitration:

> A postexpiration grievance can be said to arise under the contract only where the facts and occurrences arose before expiration, where an action taken after expiration infringes a right that accrued or vested under the agreement, or where, under the normal principles of contract interpretation, the disputed contractual right survives expiration of the remainder of the agreement.

*Litton*, 501 U.S. at 205-06.

Applying that test, it is clear that the circumstances under which Defendants allege a breach of contract and discrimination arose before the CBA terminated. If the claims "arose out of the contract," the Court must now determine if the parties negated, either expressly or by clear implication, the presumption that the arbitration clause of the CBA extends beyond its termination.

In *Nolde Brothers*, the Supreme Court stated "where the dispute is over a provision of the expired agreement, the presumptions favoring arbitrability must be negated expressly or by clear implication. *Nolde Brothers, Inc. v. Local No. 358, Bakery & Confectionary Workers Union*, 430 U.S. 243, 255 (1997). Here, the Union has not expressly rejected arbitration. In fact, it requests this Court to order arbitration. Whether the Union, however, has by clear implication negated the presumption of arbitration is addressed next.

### 2.      Question of Waiver

Defendants insists that even if this dispute is arbitrable under the CBA, the Union waived its right to arbitration by participating in this lawsuit as well as by delaying assertion of arbitration. Plaintiff argues that it did not waive the right to arbitration because Defendants, not the Union, are claiming breach of contract.

"There is a strong presumption in favor of arbitration, and . . . waiver of the right

7

to arbitration is not to be lightly inferred." *O.J. Distributing, Inc. v. Hornell Brewing Co.*, Inc., 340 F.3d 345 (6th Cir. 2003). Although the waiver of the right to arbitration is "not to be lightly inferred," the Sixth Circuit recognized that a party may waive the right by delaying its assertion to such an extent that the opposing party incurs actual prejudice. *Id.*; *see also Gen. Star Nat'l Ins. Co. v. Adminstratia Asigurarilor de Stat*, 289 F.3d 434 (6th Cir. 2002)(finding waiver where defendant did not assert any right to arbitrate until seventeen months after receiving actual notice of the lawsuit, when it objected to the district court's entry of default judgment against it).

In *O.J. Distributing*, the court noted, "both this Court and our sister circuits have been willing to find under appropriate circumstances that a party has waived its right to arbitrate by virtue of its actions in delaying the right to the point of prejudicing the other party." *O.J. Distributing*, 340 F.3d at 357. The *O.J. Distributing* court found that the defendant waived its right to arbitrate by engaging the plaintiff in thirteen months of prelitigation negotiations and two months of negotiations after litigation was filed, during all of which the defendant denied "the existence of the Agreement and, therefore, the arbitration provision." *Id.* The court held, "Defendant slept on its [arbitration] rights for approximately fifteen months . . . while Plaintiff incurred costs associated with the matter and was prejudiced as a result." *Id.* at 358.

If the Union wished to assert a right to arbitration, it should have done so before now. While the Union's actions alone are sufficient to conclude that it waived arbitration, the fact that the Union did not demand arbitration or maintain that Defendants' claims were subject to arbitration until now, provides a further basis to conclude that the Union waived its right to arbitrate. Accordingly, as in *O.J. Distributing*,

the Court finds that the Union did waive its right to arbitrate.

**B.    Discrimination Claim**

IES and TLG allege that the Union discriminated against them on the basis of the national origin of their workers in violation of 42 U.S.C. § 1981.  The primary basis for Defendants claim is that the Union: (1) permitted favored contractors to leave the union at-will; (2) failed to investigate allegations of bid rigging by other union contractors; (3) failed to investigate allegations that other union companies were operating double-breasted; (4) failed to provide educational materials for apprentice painters in Spanish despite IES's requests; and (5) provided materials written in Spanish to harass and incite Spanish-speaking workers against IES and TLG.

The Union does not specifically respond to these allegations.  As far as the Court can tell, the Union attempts to present evidence that it did not engage in disparate treatment discrimination.  The Court presumes this is the significance of the section of its brief entitled "The Alter Ego Focuses on Sham Transactions or Mere Technical Chances In Operations In Order to Avoid Collective Bargaining Agreements." This section references testimony from Rito Llamas.  The Union states that "when pressed, the only 'double breasted' company Mr. Llamas could come up with was Madias; and, as the record reveals, all of the Madias companies are union affiliated."  Union Ex. A. As further evidence, the Union attaches the deposition transcript of Marcos Madias, who testifies that all Madias companies are affiliated with unions.  Union Ex. C.  Again, the Court presumes that the Union does this in an attempt to establish that no genuine issues of material fact exist as to Defendants' discrimination claim.

In an effort to meet its burden, Defendants present evidence demonstrating they

9

were subject to disparate treatment.  First, to support their claim that the Union allowed other contractors to leave at-will, Defendants point to testimony from Tommy Thomas, the Union's business agent, stating that someone above him permitted contractors to move in and out of the union at-will.  Def. Ex. S, pp. 127-28).

Second, Defendants provide testimony from George Lancaster, a union member, admitting that he set-up a nonunion company but never received any inquiry from the Union.  Def. Ex. Z, pp. 45-49; 56-57.  Defendants argue this demonstrates the Union allowed other employers to operate double-breasted without recourse.

In addition, Defendants attach exhibits which purport to show that another non-minority union contractor, Duross Painting, is subcontracting to Duross Maintenance Company, a nonunion company, to perform painting work.  Further, Defendants note that Mr. Thomas testified that he personally developed Spanish language" informational materials" but could not identify why there were no "informational materials" in other languages such as Albanian.  Def. Ex. S.  A review of transcripts reveals that Mr. Thomas stated he created the Spanish language "informational materials" because Spanish speakers were the Union's largest growing workforce.

Section 1981 prohibits intentional race discrimination in the making and enforcing of contracts with both public and private actors. 42 U.S.C. § 1981. The statute's protection extends to "the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." Id. § 1981(b).

The Sixth Circuit held that to prevail on a claim of race discrimination under § 1981 relying on circumstantial evidence, a plaintiff must meet the burden-shifting

standard of proof for Title VII cases established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), and *Texas Dep't of Cmty Affairs v. Burdine*, 450 U.S. 248 (1981). *Christian v. Wal-Mart Stores, Inc.*, 252 F.3d 862, 867-868 (6th Cir. 2001); *see also Harvis v. Roadway Express, Inc.*, 923 F.2d 59, 61 (6th Cir. 1991). Under this standard, a plaintiff must first establish a *prima facie* case of discrimination by a preponderance of the evidence. The burden of production then shifts to the defendant to articulate a legitimate, non-discriminatory reason for its actions. To prevail, the plaintiff must then prove by a preponderance of the evidence that the defendant's proffered reason is not its true reason but a pretext for discrimination. *Id.*

Neither party addresses the burden of proof. The Court **DENIES** the Union's Motion on this issue.

### C. Defamation and Tortious Interference Claims

The Union argues Defendants' state law claims are preempted by the National Labor Relations Act, 29 U.S.C. § 141 et seq. ("the Act," "NLRA"), because the activities at issue are "arguably subject to . . . § 8 of the Act," *San Diego Building Trades Council v. Garmon*, 359 U.S. 236, 244-45 (1959), such that there is a potential for conflict between the NLRA and state law.[5]

In *Garmon*, the Supreme Court held that "when an activity is arguably subject to

---

[5] Section 7 protects the rights of employees to organize labor unions and collectively bargain. See 29 U.S.C. § 157. Section 8(a) defines unfair labor practices by the employer, including interfering with, restraining, or coercing employees in the exercise of their Section 7 rights, while Section 8(b) defines unfair labor practices by the labor union. See id. § 158(a), (b). Section 8(c) provides free expression of views shall not constitute an unfair labor practice "if such expression contains no threat of reprisal or force or promise of benefit." Id. § 158(c). The remaining subsections of Section 8 arguably are not relevant. Id. § 158(d)-(f).

§ 7 or § 8 of the Act, the states as well as the federal courts must defer to the exclusive competence of the National Labor Relations Board if the danger of state interference with national policy is to be averted." 359 U.S. at 245.  This principle arises from recognition of Congress' intent as embodied in the NLRA.[6]

Despite the general rule of preemption, the Supreme Court recognized "where the regulated conduct touche[s] interests so deeply rooted in local feeling and responsibility . . . in the absence of compelling congressional direction," the state cause of action [is] not preempted."  *Id.* at 244.

In *Linn v. Plant Guard Workers, Local 114*, 383 U.S. 53 (1966), the Supreme Court applied this exception. The Court stated that although the NLRA "tolerates intemperate, abusive and inaccurate statements made by the union during attempts to organize employees," the NLRA does not give "either party license to injure the other intentionally by circulating defamatory or insulting material known to be false."  *Id.*  Instead, a suit for "libel issued with knowledge of its falsity or with reckless disregard" of its truth is a merely peripheral concern of the LMRA.  *Id.*  An "'overriding state interest' in protecting its residents from malicious libels" justifies excepting defamation actions arising in labor disputes from *Garmon* preemption.  *Id.*

The Union contends that the underlying controversy in this case was a labor

---

[6]"Congress did not merely lay down a substantive rule of law to be enforced by any tribunal competent to apply law generally to the parties. It went on to confide primary interpretation and application of its rules to a specific and specially constituted tribunal and prescribed a particular procedure for investigation, complaint and notice, and hearing and decision, including judicial relief pending a final administrative order. Congress evidently considered that centralized administration of specially designed procedures was necessary to obtain uniform application of its substantive rules and to avoid these diversities and conflicts likely to result from a variety of local procedures and attitudes towards labor controversies. . . . A multiplicity of tribunals and a diversity of procedures are quite as apt to produce incompatible or conflicting adjudications as are different rules of substantive law."  Garner v. Teamsters Local 776, 346 U.S. 485, 490-91 (1953).

dispute and, therefore, the NLRB has exclusive jurisdiction.  If the Union's activities complained of occurred within the context of a "labor dispute," Defendants' defamation and tortious interference claims are preempted by federal labor law.  *Old Dominion Br. No. 496, Nat'l Ass'n Letter Car. v. Austin*, 418 U.S. 264 (1974)(citing *Linn v. United Plant Guard Workers*, 383 U.S. 53 (1966)).  *Linn* and *Austin* strike a compromise between state laws penalizing defamatory publication and federal labor policy protecting freedom of speech.  As such, when the NLRA is implicated, i.e. during labor disputes, state defamation actions are partially preempted, and Defendants are required to meet an actual malice standard similar to that announced in *New York Times Co. v. Sullivan*, 376 U.S. 254 (1964).  *Austin*, 418 U.S. at 280.

"Labor dispute" is defined within the NLRA as "any controversy concerning terms, tenure or conditions of employment, or concerning the association or representation of persons in negotiating, fixing, maintaining, changing or seeking to arrange terms or conditions of employment, regardless of whether the disputants stand in proximate relation of employer and employee."  29 U.S.C. § 152(9).  Defendants contend the March, 2004  termination letter sent to the Union effectively ended any labor dispute. The Court disagrees.

The definition of a labor dispute under the NLRA is broad, and "rarely have courts found concerted union activities to fall outside of this broad definition." *Hasbrouck v. Sheetmetal Workers Local 232*, 586 F.2d 691, 694 (9th Cir. 1978).  Where the union acts for some arguably job-related reason and not out of pure social or political concerns, a "labor dispute" exists.  *Id.*  Courts routinely find that a labor dispute exists in situations which do not involve any organizing activities by a union.  *See NLRB*

13

*v. Construction & General Laborers' Union Local 270*, 398 F.2d 86 (9th Cir.

1968)(finding coercive statements by a union business representative and threats to

shut down a union job site unless a nonunion subcontractor ceased work, were a

secondary boycott and unfair labor practices).

　　　　The Union implicitly asserts that Mr. Thomas' alleged statements that Defendants

paid nonunion wages and did not adhere to the union contract constitutes a labor

dispute.  The Court is persuaded that the Union's agents activities did involve the

"terms" and "conditions" of employment.  As such, a labor dispute existed which partially

preempts Defendants' state defamation and tortious interference claims.

　　　　1.　　　Defendants' Defamation Claim

　　　　Even in the context of a labor dispute, malicious defamation enjoys no

constitutional protection.  *Linn v. United Plant Guard Workers*, 383 U.S. 53, 63 (1966).

Despite the general rule of preemption, the Supreme Court in *Linn* articulated an

exception for libel actions against unions.  The Court stated that, although the NLRA

"tolerates intemperate, abusive, and inaccurate statements made by the union during

attempts to organize employees," the NLRA does not give "either party license to injure

the other intentionally by circulating defamatory or insulting material known to be false."

*Id.* at 61.  Instead, a suit for "libel issued with knowledge of its falsity or with reckless

disregard" of its truth is merely a peripheral concern of the LMRA.  *Id.*  An "overriding

state interest in protecting its residents from malicious libels" justifies excepting

defamation actions arising in labor disputes from *Garmon* preemption.  *Id.*

　　　　As far as the Court can tell, there are three defamatory "statements" attributed to

14

the Union.[7]  First, the Union allegedly represented to Patrick Henry Middle School that IES failed to make fringe benefit contributions.  Second, the Union allegedly represented to Wayne State University that TLG did not pay workers the prevailing wage.  Third, the Union allegedly represented to Western Michigan University ("WMU") that the Defendants were a "bad" company that failed to make benefit contributions. Def. Ex. Q.

As to the first statement, IES argues that the Union made this statement despite knowing the CBA terminated and Defendants were no longer obligated to make contributions.  *See* Def. Ex. Q. (affidavit of Julie Llamas attesting the statements were made in September, 2004).  The presence of a false statement of fact is the *sine qua non* for the maintenance of a state defamation action in the labor field.  *Austin*, supra, at 283.  While statements in the form of opinions or questions do not enjoy absolute protection as such, to be actionable such statements must be "reasonably read as assertions of a false fact."  *Milkovich v. Lorian Journal Co.*, 497 U.S. 1 (1990).

Whether the Union made false assertions of fact is applicable to the first and second statements set forth above.  The Union plausibly could have verified that IES made fringe benefit contributions or whether TLG was paying workers the prevailing wage.  *See Janklow v. Newsweek, Inc.*, 788 F.2d 1300, 1303 (8th Cir. 1986)("If a statement cannot be plausibly verified, it cannot be seen as 'fact'").  It cannot be said, however, that at the time the Union made the statements regarding the fringe benefit

---

[7]Under Michigan law, the elements of a cause of action for defamation are (1) a false and defamatory statement concerning plaintiff, (2) an unprivileged publication to a third party, (3) fault amounting at least to negligence on the part of the publisher, and (4) either action ability of the statement irrespective of special harm (defamation per se) or the existence of special harm caused by the publication (defamation per quod).  *Burden v. Elias Brothers Big Boy Restaurants*, 240 Mich. App. 723, 726 (2000).

contributions, it was false.  This is the main question of the underlying lawsuit.

Nevertheless, for purposes of summary judgment, the Defendants brought forth evidence to prove that the first and second statements were in fact defamatory, published, and "false," therefore, meeting their threshold burden.[8]  The Court must now determine whether the Union's statements were made with "reckless or knowing falsity." *Linn* at 284.

In order to satisfy the 'reckless disregard' test of actual malice, Defendants are required to present evidence that the statements were published with a high degree of awareness of probable falsity and that the Union in fact entertained serious doubts as to the truth of the matter published.  *Gaynes v. Allen*, 128 Mich.App. 42, 52, 339 N.W.2d 678 (Mich.App.1983) (quoting *Garrison v. Louisiana*, 379 U.S. 64 (1964)).  The Union contends that statements were not made with malice or reckless disregard for the truth. However, the Union's actions may constitute reckless disregard for the truth if believed by the fact finder.

As to the third statement, the Union argues, that Mr. Thomas' accusation that IES was a "bad" contractor, "falls short of a deliberate or reckless truth."[9]  The Court agrees. Yet, Defendants allege that Mr. Thomas said they were "bad" contractors because they did not pay contribution benefits.  Thus, this statement is also actionable because Defendants have put forth evidence that it was uttered with reckless disregard for the truth.

---

[8]The Union did not argue in its brief that the statements were not published and defamatory. Defendant IES references the termination letter as evidence that the Union knew the CBA terminated, and thus, they were not obligated to pay benefits.

[9]The Union does not specifically address the all statements alleged by Defendants.

Thus, summary judgement is inappropriate as to this issue.

2.     *Defendants' Tortious Interference Claim*

The Union argues that the conduct of its agent, Mr. Thomas, is governed by

Section 8(b)(4)(ii)(B) of the NLRA.  29 U.S.C. § 158(b)(4)(ii)(B).  This section makes it

unlawful for a labor organization or its agents to threaten, coerce, or restrain any person

engaged in commerce or in an industry affecting commerce, where the object thereof is

forcing or requiring any person to cease doing business with any other person.  *Id.*

Here, the alleged activities (*supra* section II) underlying Defendants' claim of

tortious interference are arguably within the prohibitions of § 8(b) of the NLRA.  The

Union's alleged misconduct was in response to Defendants' attempt to terminate the

CBA.  Coercive conduct based on union activities falls within the *Garmon* doctrine

because it directly relates to unfair labor practices, which are the domain of the NLRB.

This court's adjudication could create direct conflict with federal labor law and may

interfere with the effective administration of national labor policy.  While claims of

tortious interference touch deeply rooted feelings of local responsibility, the Court lacks

subject matter jurisdiction to address Defendants' clams since the NLRB has

preemptive jurisdiction in secondary boycott claims based on union activities.  *See*

*Sears Roebuck & Co. v. San Diego County Dist. Council of Carpenters*, 436 U.S. 180

(1978); *see also Harvey Indus., Inc. v. Int'l Union of Electronic, Electrical, Salaried*

*Machine & Furniture Workers, AFL-CIO, et al*, 715 F. Supp. 171, 177 (E.D.Tex.

1989)(stating that "any allegation of unlawful interference with business necessarily

raises issues concerning the object of concerted labor activity, an inquiry that remains

the exclusive jurisdiction of the NLRB.  The exercise of state jurisdiction over an

17

employer's tort claim of malicious interference with business against a collective
bargaining unit entails significant risk of interfering with the regulatory jurisdiction of
NLRB and generating conflicting substantive rules.").  This claim is dismissed.

**D.   Antitrust Claim**

IES claims that the Union "restrained trade by acting in concert with certain union
contractors in a scheme to reduce competition in the bidding process by permitting
these certain union contractors to bid on prospective projects [with] wages lower than
that required by the collective bargaining agreements, while at the same time
demanding and/or otherwise requiring other union contractors, including IES, to bid at
the higher wage rates of their collective bargaining agreements," in violation of the
Sherman Act, 15 U.S.C. § 1 *et. seq.*

The Union argues there is no factual basis for Defendants' Antitrust claim.  In
support,  the Union cites to Rito Llamas' deposition.  There, Llamas stated that the
Union allowed nonunion contractors to underbid construction jobs and then allowed the
union counterpart to the nonunion company to perform the work.  He testified that he
had documents showing that the Union allowed Madias Trucking Company to engage in
this practice by awarding it a hundred thousand dollar painting job.  He states that
Madias is doing this with other contractors and alludes that he has documentary proof.
Defendant Rito Llamas also testifies, however, that he is not aware of any jobs where
Madias underbid IES.  Union Ex. A.  In response, the Union provides the deposition
testimony of Marcos Madias, the president of Madias Brothers, Incorporated.  Marcos
Madias testifies that Madias Brothers as well as two other companies, First Evergreen
Inc. and Grove Recycling Services, are all union contractors.  Union Ex. C.  Based on

18

the testimony of Defendant Rito Llamas and Marcos Madias, the Union argues that there is no factual basis for a claim of anti-trust.

To the contrary, Defendants argue that the Union clearly engaged in restraint of trade. Defendants claim that the Union refused to provide Spanish speaking training materials; demonstrated favoritism toward certain "preferred" contractors; refused to investigate known bid rigging; and relentlessly pursued IES for benefit contributions after it terminated the CBA while allowing other preferred contracts to move in and out of union status. Defendants rely on the same facts and evidence presented for its others claims.

To set forth a § 1 claim, a plaintiff must allege that the conspiracy or combination resulted in "adverse, anticompetitive effects within relevant product and geographic markets." *Crane & Shovel Sales Corp. v. Bucyrus-Erie Co.*, 854 F.2d 802, 805 (6th Cir. 1998). Further, a plaintiff must demonstrate that the defendant's actions had the result of suppressing competition in a given market such that it can be fairly said that there has been a "restraint of trade" within the meaning of § 1 of the Sherman Act. *Id.* To make this showing, a plaintiff must allege that the defendant enjoyed market power, because without such power, a defendant cannot have an adverse impact on competition. *See Hand v. Central Transport, Inc.*, 779 F.2d 8, 11 (6th Cir. 1985).

In the labor context, the Supreme Court created a "non-statutory" exemption for agreements between unions and employers. *Allen Bradley Co. v. Local No. 3, IBEW*, 325 U.S. 795 (1945). If, however, a union and an employer enter into a contract with conscious knowledge or intent that it would be used to drive competitors out of business, then the exemption is inapplicable and a violation of the antitrust laws has

19

occurred.  *Snyder Co. v. Associated General Contractors of America, Detroit Chapter*, Inc., 677 F.2d 1111, 1119 (1982).  Defendants have made no such allegations.

The only allegation that raises an inference of antitrust violations is Defendants' claim that the Union allowed bid rigging.  Defendants provide the testimony of Mr. Thomas stating that "someone above him allowed bid rigging."  Without showing that the Union and other employers formed a conspiracy with the intention of driving competitors out of business, Defendants' claim lacks factual basis and fails.  *Id.*; *see also Crane*, 854 F.2d at 805 (holding that essential elements must be alleged in more than vague and conclusory terms to avoid dismissal).

### E.    CBA Terminated Effective May, 31, 2004

In its Reply brief, the Union presents a cursory argument that the CBA did not terminate as of May 31, 2004.  The Court addresses this argument fully in its memorandum regarding Defendants' Motion for Partial Summary Judgment.

## V.    CONCLUSION

The Court **DENIES** in part and **GRANTS** in part the Union's Motion for Summary Judgment.  The Defendants' discrimination and defamation claims remain for trial.

**IT IS ORDERED**.

S/Victoria A. Roberts
Victoria A. Roberts
United States District Judge

Dated:  March 27, 2007

20

The undersigned certifies that a copy of this document was served on the attorneys of record by electronic means or U.S. Mail on March 27, 2007.

S/Linda Vertriest
Deputy Clerk