UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

TRUSTEES OF THE PAINTERS UNION
DEPOSIT FUND, a voluntary unincorporated trust,

       Plaintiff,

    vs.                               Case No: 05-70110
                                         Honorable Victoria A. Roberts

INTERIOR/EXTERIOR SPECIALIST, CO.,
Michigan corporation, THE LLAMAS GROUP,
CORP., a Michigan corporation, and
RITO JULIAN LLAMAS, individually,
jointly and severally,

       Defendants.

AND

INTERIOR/EXTERIOR SPECIALIST, CO.,
a Michigan corporation, THE LLAMAS GROUP,
CORP., a Michigan corporation, and
RITO JULIAN LLAMAS, individually,
jointly and severally,

       Counter-Claimants and
       Third-Party Plaintiffs,

vs.

TRUSTEES OF THE PAINTERS UNION
DEPOSIT FUND, a voluntary unincorporated trust,

       Counter-Defendant,

AND

PAINTERS DISTRICT COUNCIL NO. 22
OF THE INTERNATIONAL BROTHERHOOD
OF PAINTERS AND ALLIED TRADES (AFL-CIO)

       Third-Party Defendant.
_____/

1

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

## I.    INTRODUCTION

This matter came before the Court for a non-jury trial.  The parties submitted the

following as their "Concise Joint Statement of the Case" in their Joint Final Pre-Trial

Order:

> Plaintiff Fund seeks from all three defendants fringe benefits and liquidated
> damages due in accordance with a collective bargaining agreement ("CBA"),
> a personal guaranty, and alter ego liability.  Defendant IES seeks from
> Plaintiff a return of the $56,356.27 of fringe benefit payment made after May
> 31, 2004.  The [D]efendants also seek damages from Third-Party Defendant
> Painters District Council No. 22 (the "Union") for defamation and
> discrimination.

The Trustees of the Painters Union Deposit Fund ("Trustees") bring their claim

for unpaid fringe benefits under the Labor Management Relations Act of 1947, 29

U.S.C. § 141, *et seq.*, ("LMRA"), and the Employee Retirement Income Security

Act of 1974, 29 U.S.C. §§ 1132, 1145 ("ERISA").  Defendants are

Interior/Exterior Specialist, Co. ("IES"), The Llamas Group, Corp. ("TLG"), and

Rito Julian Llamas ("Mr. Llamas").  Defendants IES and TLG assert crossclaims

against Painter District Council No. 22 of the International Brotherhood of

Painters and Allied Trades (AFL-CIO) ("the Union") for discrimination pursuant to

42 U.S.C. § 1981 and for defamation under the laws of Michigan.  IES'

counterclaim for breach of contract is pursuant to federal common law.  The

Court has jurisdiction over the federal claims under 28 U.S.C. § 1331,  29 U.S.C.

§ 185(a), 29 U.S.C. § 1132(a)(3).  The Court has supplemental jurisdiction over

the state law claims under 28 U.S.C. § 1367.  However, the findings and

conclusions of law are that federal law preempts the state claims. *See infra* ¶¶ 233-255.

A bench trial was conducted on December 10th, 11th, and 12th, 2007.

## II. FINDINGS OF FACT

### A. Alter Ego

1. <u>Ownership and Management</u>

1. IES was incorporated on July 31, 1997 by Mr. Llamas, and he is its registered agent.

2. Mr. Llamas is the sole shareholder, officer (President), and director of IES, and runs its day-to-day operations.

3. Nonetheless, Mrs. Llamas signed the State of Michigan IES tax filing for 2003 as President of IES.

4. The CBA, signed October 5, 1998 by Mr. Llamas, lists Mrs. Llamas as Vice-President of IES.

5. TLG was incorporated on March 30, 1999 by Mrs. Llamas.

6. Mrs. Llamas is the sole shareholder, officer, and director of TLG.

2. <u>Business Purpose</u>

7.   IES performs industrial and selective demolition work, but largely focuses on painting.

8.   IES was a union contractor pursuant to a CBA with the union until May 31, 2004.

9.   TLG is a non-union general contracting firm whose work includes design/build, concrete work, and masonry work.  Prior to a May 21, 2004 settlement agreement with the Union and IES, TLG also did some painting work.

10.  TLG focuses on private sector jobs; IES focuses on public sector jobs.

3. <u>Equipment</u>

11.  IES and TLG have separate field equipment.

12.  IES and TLG do not rent or lease equipment from each other.

13.  IES and TLG do not share office equipment such as: copiers, computers, and telephones.

14.  IES and TLG have separate automobiles.

15.  IES and TLG have separate cell phone accounts.

16.  IES and TLG each pay for their own office supplies and computers.

17.  IES and TLG have separate storage facilities for equipment and materials.

4. <u>Operations</u>

18.  Mr. and Mrs. Llamas jointly own the Allen Road Building.  TLG has always operated from this building.  IES operated out of a building in Lincoln Park until late 2000 or 2001, and then moved to the Allen Road Building, where TLG and IES lease space.

19.  TLG often pays IES a largely arbitrary building management fee.  The

management fee purportedly covers the rent, utilities, snow removal, lawn care, upkeep on the building, repairs and upgrades.  However, the companies do not keep accurate records of the amount of the management fee or of the services on which the management fees are based.

20.  TLG and IES have separate bank accounts, lines of credit, vendor credit accounts, credit cards, federal employer identification numbers, corporate records, phone numbers, internet domains, tax accounts for the State of Michigan, tax accounts for the City of Detroit, unemployment accounts, worker's compensation insurance, and office personnel.

21.  There were three signatories to the IES checking account: Mr. Llamas, the IES office manager, and Mrs. Llamas.

22.  From September 2001 to April 2005, IES wrote at least 10,000 checks.

23.  From September 2001 to April 2005, TLG wrote at least 15,000 checks.

24.  There were two signatories on the TLG checking account: Mr. and Mrs. Llamas.

25.  Mr. Llamas signed four TLG checks totaling $3,478, one of which was payable to him in the amount of $1,700.

26.  Mr. Llamas testified that twelve TLG checks were paid to IES totaling $423,787.47.  He offered no opinion about two of these checks totaling $37,500. He testified that some were likely for a job, a loan, or an account payable. However, he was not sure what the purpose was for six of the checks with a total value of  $232,817.78.

27.  Mr. Llamas was not sure of the purpose of five IES checks payable to Mrs. Llamas, totaling $7,182.20.

28. Mr. Llamas was not sure of the purpose of six IES checks signed by Mrs. Llamas totaling $28,071.92.

29. Mr. Llamas was not sure of the purpose of a $21,000 bank charge of IES to TLG, nor of a $20,000 account charge written to TLG but then scratched out and charged to IES.

30. Prior to the incorporation of TLG, Mrs. Llamas did data entry for IES and worked on its books and records. After TLG was formed, Mrs. Llamas continued to help with the checkbook for IES.

31. Shaneez Gill did temporary work for IES, and was hired at times as a temporary worker for TLG. However, she did not work for both during the exact same time period.

32. Different people usually answer the phone for TLG and IES. Staff from either office can see the phone ringing for the other company. On occasion, if nobody is available to answer the phone from one company, staff from the other company will pick up the line.

33. In the last five years, IES has had 250 to 300 employees.

34. Painting employees freely floated between TLG and IES depending on which company had work to do.

35. Mr. Ruehle found that many of the TLG painters who performed work in 2001 and 2002 were also employed by IES. Several of these employees appeared on the payrolls of IES and TLG in the same month, and more than fifty percent of the IES employees also worked for TLG.

36. The employment-shifting patterns Mr. Ruehle noticed for the TLG and IES

painters continued in 2003 and 2004 but were not as stark as they were for 2001 and 2002.

37. Prior to May 31, 2004, fourteen painters performed work for both IES and TLG.

38. After the settlement agreement TLG painters either went to IES to work or, if they didn't want to become part of the union, they were laid off.

39. TLG and IES had different geographical territories with respect to their operations. TLG's geographical area was generally limited to the tri-county area of Wayne Oakland and Macomb, while IES worked from Toledo to Marquette.

40. The IRS audited TLG several months after the Trustees' expert, Robert Scheuer, was deposed. The IRS concluded that there was nothing wrong with TLG's tax returns from 2003 and 2004. Although the audit also involved examination of some of the transactions between TLG and IES, it was not a comprehensive audit of IES.

41. Mrs. Llamas received substantial pay from IES during 2001 and 2002.

42. Mr. Llamas received substantial pay from TLG during 2001.

43. Substantial transfers of money between IES and TLG are noted in the check registers simply as "accounts payable/trade."

44. The IES 2002 federal tax return, IES general ledger, and TLG general ledger indicate that IES received a management fee of $106,254 for the fiscal year ending in 6/30/03. However, no evidence was presented to substantiate the amount of the fee, or why it was paid.

45. The parties stipulated that the TLG general ledger for the same fiscal period ending June 30, 2003 shows equipment rental of $71,200 on June 30, 2003. It

contains a specific category, denoted "6290 rent," for rental of IES equipment. However, no evidence was presented to substantiate the amount of the $71,200 rental fee, or why it was paid.

46. Mr. Llamas did not know why in some years IES received substantial rental income and management fees from TLG, and in other years IES received little or no rental income or management fees from TLG.

47. The tax returns demonstrated that in years where TLG was more profitable than IES, large amounts of income were shifted by and between TLG and IES, without supporting agreements or documents, in a manner that resulted in a reduction of TLG's income taxes.

48. Because IES for the year ending June 30, 2003 had negative taxable income in excess of the equipment rental and management fees it received from TLG, its income taxes were not increased. The parties stipulated at the trial that in tax year 2003, which ended June 30, 2003, TLG had taxable income of $154,166.

49. The parties stipulated at the trial that in tax year 2003, IES had taxable income of $441,447.

50. For the fiscal year ending in 2004, the general ledgers show $172,000 in management and rental fees paid to IES from TLG, which was 39% of IES' income for that tax year.

51. Mr. Llamas testified he was not familiar with the accounting of IES, and that he merely provided information to his accounting firm that prepared IES' tax returns. He had no knowledge of any IES documents that were given to its accountant besides the general ledger.

52. The parties stipulated at trial that there were no written agreements evidencing loans between IES and TLG or any subcontracting arrangements between IES and TLG.

53. Whenever money was needed by one company the other company would loan it. Accountants later dealt with the necessary accounting records.

54. Mrs. Llamas admitted that no writings exist which evidence any agreement between IES and TLG on anything.

55. Mrs. Llamas testified that she isn't sure how the attorneys or accountants allocate the rent for the premises, that the accountants write the rent checks, and that she is not sure who the rent checks are written to.

56. Mr. Llamas sometimes helps the TLG staff if somebody is loading a spray machine or if TLG deliveries arrive.

57. IES and TLG have had and continue to have the same accounting firm.

58. Their previous accountant made all decisions concerning management fees, equipment rental, and other fees charged between the two companies.

59. Before she switched accounting firms, Mrs. Llamas did not review the tax returns before signing them or know what the fees connected to IES related to. Similarly, Mrs. Llamas does not know why there is so much debiting and crediting between IES and TLG reflected in the tax returns.

60. Robert Scheuer ("Scheuer") analyzed journal entries related to transfers of money between IES and TLG which were designated as inter-company transfers. Scheuer opined that, if IES and TLG were truly separate and independent companies, it would be inappropriate to designate these as inter-company

transfers.

61. Scheuer also identified inter-company transfers that were not equal between IES and TLG. He determined that only one out of the three years he looked at were the inter-company transfers on both sets of books equal.

62. Scheuer identified several entries where accounts receivable on one set of books should have been listed as a corresponding entry on the other set of books, but wasn't.

63. Scheuer observed extensive billing of items between IES and TLG that affected the income and cost of goods sold by the two companies.

64. Scheuer testified that the numerous inter-company transactions reflected on the books can have an effect on who is reflected as making money on each company's tax return, and had the effect of increasing or reducing the net income of each company.

65. Scheuer found it significant that, although Mrs. Llamas has testified that there were numerous loans between the companies, the tax returns identified very few loans, and there was no indication that loan interest was charged on any transactions, even though the IRS states that interest should be charged on inter-company loans between parties.

66. Scheuer testified that he saw no information that was given to IES and TLG's accountants that would have enabled them to make the entries made.

67. In comparing the tax returns to their general ledgers, Scheuer identified a couple of years where the entries in the general ledgers did not match with the entries on the tax returns when they should have.

68.	In Scheuer's opinion, IES and TLG are financially and substantially intertwined, to such an extent that it is extremely difficult to consider IES as financially separate from TLG. Scheuer stated that when such large amounts of money move between companies, and the principals neither know nor care what the transfers are for and the principals are both getting money from the two companies, more likely than not the principals do not care whether one company or the other company gets the money.

	5.	Supervision

69.	The IES field supervisors are different than the TLG field supervisors.

70.	Tony Mezzotta was a full-time IES employee who started in 1999, worked his way up to General Manager of IES, and continued in the position through at least August of 2005. Sometime thereafter, he stopped working for IES and became a supervisor for TLG.

71.	On a few occasions, Mr. Llamas helped TLG supervise its jobs without direct compensation as a favor to Mrs Llamas.

	6.	Customers

72.	IES functions as a subcontractor, so its customers are normally general contractors, such as TLG. IES' customers are often TLG's competitors.

73.	TLG would generally take in revenue and pay IES for the work that TLG subcontracted to IES.

74.	The parties stipulated at trial that the following were customers of IES from 2002 through 2004, and received payment in the following amounts, as indicated in the general ledger:

| #  | Project/Job          | Year | Amount        |
|----|----------------------|------|---------------|
| 1  | Waterstone           | 2002 | over $167,000 |
| 2  | Waterstone           | 2003 | over $64,000  |
| 3  | Tecumesh             | 2003 | $30,000       |
| 4  | John Glenn           | 2002 | over $100,000 |
| 5  | John Glenn           | 2003 | over $45,000  |
| 6  | Andrews (residence)  | 2003 | over $40,000  |
| 7  | Lawrence Tech        | 2003 | over $245,000 |
| 8  | Allen Park/Way       | 2002 | $9,600        |
| 9  | Town Village Sterling| 2002 | over $80,000  |
| 10 | Town Village Sterling| 2003 | over $12,000  |
| 11 | Genoa                | 2002 | over $45,000  |
| 12 | Dexter               | 2002 | over $200,000 |
| 13 | Frank Murphy/Way     | 2003 | over $204,000 |
| 14 | Groves               | 2002 | over $60,000  |
| 15 | KMS                  | 2002 | over $60,000  |
| 16 | L'anse Creuse        | 2004 | $5,000        |
| 17 | Niles Center         | 2003 | over $8,000   |
| 18 | PC/720               | 2003 | over $470,000 |
| 19 | Rochester High       | 2002 | over $600,000 |
| 20 | Rochester Paint      | 2002 | over $109,000 |
| 21 | Rochester Paint      | 2003 | over $185,000 |
| 22 | Roosevelt High       | 2004 | $12,500       |
| 23 | Saline High          | 2004 | over $484,000 |
| 24 | South Lyon           | 2002 | over $335,000 |
| 25 | U of M West Hall      | 2003 | over $77,000  |

75.     The parties stipulated at trial that TLG's general ledgers reflect that TLG billed for

work for the following projects, during the following years in the following

amounts:

| # | Project/Job | Year | Amount |
|---|---|---|---|
| 1 | Waterstone | 2002 | over $160,000 |
| 2 | Waterstone | 2003 | over $43,000 |
| 3 | Tecumseh | 2002 | over $150,000 |
| 4 | Allen Park Wyandotte | 2003 | over $4,000 |
| 5 | Town Village Sterling | 2002 | over $300,000 |
| 6 | Town Village Sterling | 2003 | over $30,000 |
| 7 | Genoa | 2002 | over $16,500 |
| 8 | Andrews | 2003 | over $6,600 |
| 9 | Dexter | 2002 | $10,000 |
| 10 | Frank Murphy/Way | 2004 | $25,000 |
| 11 | Groves | 2002 | $10,000 |
| 12 | John Glenn | 2003 | $10,000 |
| 13 | KMS | 2003 | $20,000 |
| 14 | L'anse Creuuse | 2004 | over $57,000 |
| 15 | Lawrence Tech | 2003 | over $80,000 |
| 16 | Niles Center | 2003 | over $8,700 |
| 17 | PC/720 | 2003 | $28,000 |
| 18 | Rochester High | 2002 | $21,000 |
| 19 | Rochester Paint | 2002 | $21,000 |
| 20 | Rochester Paint | 2003 | $20,000 |
| 21 | Roosevelt High | 2004 | over $60,000 |
| 22 | Saline High | 2004 | over $25,000 |
| 23 | South Lyon | 2002 | $25,000 |

| 24 | U. of M. West Hall | 2002 | over $5,800 |

76. The following represent cases where TLG subcontracted painting work to IES: Waterstone, Tecumseh, Genoa, L'anse Creuse, Niles Center, and Roosevelt High projects. However, IES and TLG do not assert subcontracting from TLG to IES for, at least, the John Glenn, Lawrence Tech, Town Village Sterling, Dexter, Frank/Murphy Way, Groves, KMS, PC/720, Rochester High, Rochester Paint, Saline High, South Lyon, and University of Michigan West Wall projects, which IES and TLG worked on in the same or subsequent years.

   7.   Intent to Evade

77. The IES general ledger for the fiscal year ending in 2003 shows five bills from TLG for subcontracting: $5,000, $26,500, $4,000, $5,000, and $16,500.

78. A member of the Union, Steven Chaney, complained to the Union in or around 2003 that he was painting for both TLG and IES and that he was not receiving the benefits of the Union contract when working for TLG. Chaney provided the Union with pay stubs which indicated that he worked for both companies.

79. On or about July 18, 2003, Steven Chaney filed an unfair labor practice charge with the National Labor Relations Board against IES and TLG alleging alter ego liability.

**B.   Defamation**

   1.   Patrick Henry School

80. As of September 2004, IES had not made June or July fringe benefit contributions to the Union trust fund.

81. George Lancaster, an IES employee, testified that in September or early October of 2004 he called the Union and spoke to Tommy Thomas ("Thomas"), the Union's Business Representative for his jurisdiction, and told him his fringe benefits had not been paid on the job. He had received a letter stating that his insurance would be cancelled because the contractor had made benefit contributions.

82. Thomas went to the job site and advised the superintendent that IES was delinquent in its fringe benefit contributions. He said the Union would have to put a lien on the job, review payroll records, or remove Union workers from the site, unless IES brought its benefit obligations up-to-date.

83. The Union represented to non-parties that IES was a union contractor.

84. Later that day, Mr. Llamas provided Thomas with a check for the past due fringe benefit payments by IES.

85. The Union had a good faith belief prior to early December 2004 that IES would again renew its status as a Union contractor and, therefore, had an obligation to make fringe benefit contributions despite IES' March 23, 2004 termination letter.

86. When questioned by Robert Kennedy ("Kennedy"), the Business Manager, Secretary and Treasurer of the Union about problems paying fringe benefits, Mr. Llamas had previously responded that the omission was because of cash flow problems. He gave the same response when he communicated with Kennedy about the Patrick Henry School project.

    2.    <u>Wayne State University</u>

87. Thomas testified that in 2003, when he was at Wayne State picketing a job at a

parking structure performed by a nonunion company unrelated to this case, he spoke with Robert Moore, who was supervising a painting job at Wayne State performed at an adjacent location. Thomas was not familiar with TLG then.

88. Moore, a TLG job foreman, told Thomas that IES was supposed to do the work on the job.

89. Thomas spoke with Kennedy, who confirmed that IES was supposed to perform the work on the job. Kennedy suggested to Thomas that he check on the job.

90. The next day, Thomas again went to the job site and was told by some of the painters on the job that they were employees of TLG. Thomas understood TLG to be a nonunion contractor. He also asked workers to produce their union cards; they were unable to do so.

91. Based on his understanding that the job was improperly performed by nonunion workers, Thomas put a picket line up on the job. Thomas testified that the picket line said that TLG was not a signatory with the Union. However, the Court found the testimony of Mrs. Llamas more credible than that of Thomas, and finds that the Union's picketers held signs on the Wayne State University project that stated, "Llamas Group pays unfair wages."

92. At trial, Thomas admitted that he had no way of knowing whether TLG was paying the prevailing wage or not.

3. <u>Western Michigan University</u>

93. The IES Western Michigan University job occurred in early December 2004, but before Mr. Llamas had definitively advised Kennedy that IES no longer intended to be a Union contractor.

94. Thomas received a call from an employee working for IES on this job, Gustavo Torres, who complained that fringe benefits were not being paid.

95. After Thomas arrived at the site, he spoke with two job superintendents, who were employees of Granger Construction. Thomas advised them that IES was not paying fringe benefits to its employees working on the job. Thomas asked if they could provide some help with the situation, such as getting joint checks issued so that they could not be cashed without the Union's fund's signature.

96. After speaking to Thomas on the phone and telling his workers to leave the job, Mr. Llamas went to the Union headquarters with two of his employees, and declared that he was no longer going to be a party to the CBA.

**C.  Racial Discrimination**

   1.  <u>The Union</u>

97. Mr. Llamas is Hispanic and his company is Hispanic owned and controlled.

98. No evidence was presented regarding the precise number or percentage of Hispanic employees of IES or TLG.

99. While he was a journeyman painter and before he started IES, Mr. Llamas complained to Mr. Kennedy, the Union's business agent, about selective enforcement and non-enforcement of the CBA. He complained about improper subcontracting by Madias Brothers Painting Company, Duross Painting Company, and E&L Commercial Interiors when he worked with them.

100. At least twice while a journeyman painter, Mr. Llamas presented proof to Mr. Kennedy that his pay stubs from Madias and E&L did not match the benefits they paid him.

101.  The only remedy Kennedy offered was that Llamas talk to his employers.

102.  While Kennedy told the accused companies of Llamas' complaints, he took no action to address Mr. Llamas' grievances.

103.  Mr. Llamas stopped making the complaints because his hours as a painter were cut or reduced: Madias stopped using Mr. Llamas as a journeyman painter and E&L cut his hours.

104.  Journeymen were then making between $40,000 and $50,000 per year, but Mr. Llamas's pay dropped to $17,000.

105.  Mr. Llamas started IES because of these pay cuts.

106.  The Union Apprenticeship Program ("UAP"), a training program for people who wanted to become union painters, did not take Spanish-speaking individuals because it did not have a Spanish-speaking instructor. Rather than hire one, the Union exempted anyone who did not understand English from participation in the UAP.

107.  Mr. Llamas trained Hispanic workers who could not understand English, even though the Union deducted money from their checks to pay for the UAP.

108.  Mr. Llamas repeatedly complained about this apprenticeship policy.

109.  The Union developed Spanish language "informational" materials. One purpose of the informational materials is to inform non-union members of the difference between non-union and union pay rates. The Union had not developed "informational" materials in other non-English languages.

110.  After Mr. Llamas signed the CBA on October 5, 1998 on behalf of IES, he again alleged that Union companies violated the CBA.

111. In a letter dated June 11, 2002, Mr. Llamas alleged selective enforcement and non-enforcement of the CBA. Although the letter did not state the names of specific companies, Kennedy knew whom Mr. Llamas referenced in his letter. Mr. Llamas did not receive a response.

112. On or about August 21, 2003, the Union, based on Steven Chaney's July 18, 2003 NLRB complaint (*see* ¶¶ 81-82) and its own review, concluded that IES and TLG improperly operated double-breasted companies. It filed its own NLRB charge against IES and TLG, alleging alter ego liability.

113. On April 2, 2004, Mr. Llamas sent Thomas a grievance letter complaining about union contractors who cheat.

114. Kennedy received and denied the grievance letter on April 18, 2004. In his response, he indicated that he believed Llamas's grievance was retaliatory because the Union filed alter ego charges (at that point settled) with the NLRB. Kennedy stated he believed the allegations had no basis in fact because they were only a "general statement about the industry, not a particular employer."

115. This was the Union's only response and Kennedy did not investigate Mr. Llamas' complaints before responding.

116. Nevertheless, Kennedy believed there was a significant chance the allegations were true.

117. Mr. Llamas never alleged selective enforcement of the CBA based on racial discrimination.

118. Kennedy did not take action against the accused companies, in part, because the heads of these companies held union-related leadership positions.

119. Mr. Llamas told Thomas that he had evidence that almost every painting company was an alter ego or subcontracting to non-union workers.

120. Mr. Thomas did not investigate the companies that Mr. Llamas complained about, even though he told Mr. Llamas that he had.

121. Thomas made only a single phone call to one painter concerning Madias' companies, and held discussions with a few other Union business agents concerning what they knew about Madias.

122. Between the formation of IES on July 31, 1997 and May 31, 2004, the Union did not receive formal complaints or documentary evidence from any other Union member painters that other employers acted double-breasted or were in an alter ego relationship.

123. The CBA initially terminated May 31, 2003. The Union and IES agreed to a one year extension. After this date, the CBA was automatically renewed each year unless IES sent notice sixty days before the annual anniversary date of the extension.

124. IES terminated participation in the CBA in accordance with the CBA in its March 23, 2004 letter, before the April 1, 2004 due date.

125. Mr. Kennedy admitted at trial that the Union's answer to IES and TLG's interrogatory was incorrect because it erroneously claimed that IES did not properly withdraw from the Union because it did not get the consent of the Painters District Council No. 22 and the Michigan Alliance of Union Painting Contractors ("MAUPC").

126. However, a withdrawing contractor need not notify the MAUPC or the Union

before it withdraws.

127. No adverse action had been taken against other Union contractors who withdrew from the CBA.

128. Mr. Kennedy is the highest official in the Union.

129. The NLRB charges recently filed by Roberto Gonzalez, after consultation with Kennedy, were filed by the Union in order to harass IES.

130. Multiple reasons motivated Kennedy's adverse actions (i.e., strong resistance to the termination of the contract, statements to customers which disparaged IES, interference at IES work sites, the comprehensive audit on IES and TLG, and approval of recent NLRB charges against IES by Roberto Gonzales). These reasons included: (1) retaliation against IES for attempting to leave the union; (2) strengthening the Union by making an example of IES; and (3) animus towards Hispanics and/or the perceived propensity of Hispanics to be more difficult to organize as Union members.

131. The Trustees of the Fund can only have a vote to conduct a comprehensive audit if the Union requests it.

132. Kennedy testified that in order to request a comprehensive audit, a complaint has to be lodged by an employee. He denied knowing who requested that the comprehensive audit include TLG. Kennedy stated he had to have documentation evidencing violation of the CBA, such as check stubs, from a member or employer, in order to request a comprehensive audit.

133. The complaints by George Lancaster, Daniel Chaney and Mark Chaney upon which Mr. Kennedy based his request for the comprehensive audit, did not

reference TLG.

134. Because there was no complaint relating to TLG during the post-settlement period, it may not have been proper to audit TLG. Nonetheless, TLG acquiesced to the audit and worked through the calculations of the potential amount of alter ego liability with the Fund.

2. Madias Brothers

135. Marcos Madias ("Mr. Madias") is partial owner of Madias Brothers Painting Company ("MBPC"), a signatory to the CBA.

136. Madias Brothers performs paint contracting services.

137. Mr. Madias is Greek.

138. MBPC and Madias Brothers Inc. ("MBI") (a non-union signatory) are one company.

139. MBPC is a wholly owned subsidiary of MBI.

140. MBPC and MBI have the same officers, directors, ownership, telephone number, and offices located at 12850 Evergreen Road, Detroit, Michigan. There is only one checkbook for MBPC and MBI.

141. Mr. Madias also operates First Evergreen Inc. ("FEI") and Grove Recycling Services, Inc. ("GRSI") out of the same offices using the same phone number as MBPC and MBI.

142. MBPC, MBI, and FEI use the same checking account.

143. The Union, through the Funds, annually audits Madias Brothers Painting Company at the Evergreen Road offices in the same manner it annually audits IES.

144. The Fund has not done a comprehensive audit of Marcos Madias or any of his companies since 1979.

145. The books and records of MBPC indicate payments to FEI for a $213,402.50 subcontract, a $409,294.80 subcontract, and various other subcontracts.

146. The Union or Fund never reviewed the records of Grove Recycling.

147. MBPC, MBI, FEI, and GRSI engaged in inter-company transactions among the corporate entities through loans and related party disbursements.

148. Marcos Madias, President of the MAUPC, has been a Trustee of the Funds since 2005. He was elected to this position through an election by the MAUPC.

149. One purpose of the MAUPC is to negotiate group contracts with the Union.

150. One reason the Madias companies were never subjected to a full audit is because Mr. Madias is a Trustee of the Fund and President of MAUPC.

151. FEI stopped being a signatory to the CBA when its contract expired by simply not signing another CBA.

152. FEI is currently not a signatory to the CBA with the Union, but it has a union contract with Teamsters Local 299.

153. FEI now provides custodial services for Madias companies.

154. Once FEI stopped being a signatory to the CBA, the Union never claimed it continued to be a signatory.

155. GRSI engaged in rubbish removal and disposal. It has an agreement with Teamsters Local 299.

156. MBI provides administrative services to FEI and MVPC, and has provided such services to GRSI as well. These services are related to health and welfare

benefits, vehicle expenses, and purchases by MBI that were supplied to its subsidiaries.

157.    MBPC violated the CBA by subcontracting work to non-union companies.

158.    IES did not present any evidence showing that the Union should have become aware of the violations of the CBA through the normal annual audit process.

3.    Duross Painting

159.    Duross Painting Company ("DPC") has been a signatory to the CBA since 1974.

160.    Duross Painting Company ("DPC"), Duross Maintenance Company ("DMC"), and R. Duross Financial Corporation ("DFC") have common ownership. Robert Singer ("Singer") owns 70% each of DPC, DFC, and DMC. Michelle Simon ("Simon") owns 30% in each of these companies.

161.    Singer has been the Treasurer of the MAUPC since its inception approximately ten years ago.

162.    DPC, DFC, and DMC have the same address: 27270 Gloede in Warren, Michigan.

163.    DMC does various repairs, including painting and general maintenance work.

164.    DFC is a company that Singer uses to do small repairs and maintenance work.

165.    The Fund has not done a comprehensive audit of the Duross companies.

166.    DPC, DMC, and DFC engaged in inter-company financial transactions. Specifically, DPC (the union company) subcontracts work to DMC (non-union company). DPC (union company) pays DFC (non-union company) via check for the work that DMC (non-union company) does.

167. DPC does not have written contracts for the work it subcontracts to DMC. There are no written agreements about any work among the three Duross companies.

168. Singer admitted there were occasions when his companies subcontracted work to non-union painters.

169. Both Simon and Singer are authorized to write checks for all three Duross companies.

170. The Union never asked the owners of the Duross companies for documents with respect to DFC or DMC.

171. No employees of Singer's companies ever filed a grievance or complaint with the Union claiming improper subcontracting to non-union workers.

172. The documentary evidence of Singer's subcontracting of work to non-union painters was produced pursuant to subpoenas served by IES and TLG in this case.

173. Singer admitted he "made every effort to conceal" evidence of improper subcontracting from the Union.

174. DPC violated the CBA by subcontracting work to non-union companies.

175. IES did not present any evidence that these records would indicate a violation of the CBA without the use of a comprehensive audit.

176. IES did not present any evidence showing that the Union should have become aware of the violations of the CBA through the normal annual audit process.

    4.    Abbey Painting/Lancaster Painting & Maintenance

177. George Lancaster ("Lancaster") set up a painting company called "Abby Painting" in his wife's name when Lancaster was a member of the Union.

178. He also approached the Union about setting up a union affiliated painting company called Lancaster Painting & Maintenance..

179. After Lancaster spoke with the Union about operating his own union affiliated painting business and realized he could not afford to do so, there is no evidence that Lancaster Painting & Maintenance or Abbey Painting performed painting work.

     5.    Forrest Painting

180. Mr. Nikitas Balatzis ("Balatzis") has owned non-union Forest Painting, Inc. ("FPI") since 1995. FPI first hired Hispanic workers in March or April 2005 four of six new employees.

181. In the ten years prior to hiring Hispanics, Balatzis had been approached about five times by the Union or a Union representative to sign a Union contract.

182. Kennedy planted a fully paid Hispanic Union employee, Roberto Gonzalez, with FPI. Mr. Kennedy never planted an employee in any of Mr. Madias or Mr. Duross' projects.

183. Mr. Kennedy's only union "plant," Roberto Gonzalez, is Hispanic.

184. Two months after hiring Hispanic workers, Balatzis received a call from Thomas who said that he had information that FPI was not paying some employees properly, and that a complaint may be made to the state of Michigan. Thomas said if he did not meet with him, he would send a complaint to the State of Michigan. About a week later, Balatzis received a fax and time ticket and a note indicating that wages were not being properly paid.

185. Thomas again told Balatzis that he should sit down with the Union, and Thomas

told him that if they did so, he would tell Balatzis "who the snitch is in your company."

186. Subsequently, the union plant, Roberto Gonzalez filed thirteen prevailing wage complaints against FPI.

187. In the spring of 2006, FPI let its Hispanic workers go.

188. The Union has not contacted Balatzis or FPI since they released their Hispanic workers.

189. Balatzis problems with the Union started when he hired Hispanic workers and stopped close to the time he released them.

190. The Union targeted FPI, in part, because it hired Hispanic workers.

191. The Union disproportionately targets companies that have Hispanic workers, as evidenced in part, by the fact that its only "plant" is Hispanic.

**D.    Damages**

192. The CBA covers preparatorial work, wall washing, painting, hanging of wallpaper, or wall covering, removal of wallpaper or paper cleaning.  The CBA also benefits nonunion members if they work for a contractor who is a signatory to the CBA.

193. The Union and IES, by Mr. Llamas as President, signed a CBA dated October 5, 1998.

194. Mr. Llamas signed the CBA as a personal guarantor

195. The CBA was a collective bargaining agreement negotiated between the Union and the MAUPC.  As of May 31, 2004, approximately ninety painting companies were signatories to the CBA with the Union.

196. IES was pressured by the Union to submit fringe benefit contributions of

approximately $56,356.27 for June and July 2004, but complained that it was extortion by the Union. Indeed, he communicated this to Thomas.

197. The amount of fringe benefits and liquidated damages IES owes based on the audit, independent of any alter ego issues, is $6,500, for individuals who worked solely for IES.

198. On December 14, 2004, the Trustees voted to conduct a comprehensive audit of IES. A comprehensive audit can only be performed if the Trustees vote to conduct it.

199. The Trustees issued a June 16, 2005 debit memo of $406,481.31.

200. Mr. Ruehle met with Mrs. Llamas regarding the audit. Based upon their meeting and his review of documents she presented, he prepared and issued a January 4, 2006 revised debit memo which reflected a lower amount of $378,771.81. The revised comprehensive audit memo noted only those employees who were painters or Union members.

201. The Trustees' revised calculation in light of the Court's order finding the contract terminated on May 31, 2004, is $186,781.62. It consists of unpaid fringe benefits of $155,651.35 and liquidated damages of $31,130.27, and presumes that TLG is an alter ego of IES. Although the Fund did not submit a revised memo stating this number, this value is reflected in the monthly breakdown of the January 4, 2006 memo.

## II.    CONCLUSIONS OF LAW

## A.    Alter Ego

202. The alter ego doctrine is most commonly used in labor cases to bind a new

employer that continues the operations of an old employer in those cases where the new employer is "merely a disguised continuance of the old employer." *NLRB v. Fullerton Transfer & Storage*, 910 F.2d 331, 336 (6th Cir. 1990) (quoting *Southport Petroleum, Co. v. NLRB*, 315 U.S. 100 (1942)); *see also Howard Johnson Co. v. Detroit Local Joint Executive Bd., Hotel and Rest. Employees, and Bartenders Int'l Union*, 417 U.S. 249, 259 n. 5 (1974).

203. The term also is applied to so-called double-breasted operations to determine whether two or more coexisting employers performing the same work are in fact one business, separated only in form. *Fullerton*, 910 F.2d at 336 n.7; *Yolton v. El Paso Tenn. Pipeline Co.*, 435 F.3d 571, 587 n.12 (6th Cir. 2006).

204. In both instances, the test is "whether the two enterprises have substantially identical management, business, purpose, operation, equipment, customers, supervision and ownership." *Fullerton,* 910 F.2d at 336 (quoting *Nelson Elec.v. NLRB*, 638 F.2d 965, 968 (6th Cir. 1981)); *NLRB v. Allcoast Transfer, Inc.*, 780 F.2d 576, 580 (6th Cir. 1986).

205. "No factor is controlling and all need not be present." *Allcoast*, 780 F.2d at 579*.* The analysis is "flexible" and "no element should become a prerequisite to imposition of alter ego status; rather, all the relevant factors must be considered together." *Id.* at 582; *see also Yolton*, 435 F.3d at 587. The alter ego analysis requires the "examination of all the circumstances of each case, and a weighing of all the relevant factors." *Allcoast*, 780 F.2d at 581.

206. Examination of Sixth precedent reveals a potential conflict between the holdings of two panels. In 1986, the Sixth Circuit in *Allcoast* held that intent is *not* a

29

dispositive factor in the alter ego analysis. Subsequently, in *Resilient Floor Decorators Insurance Fund v. A & M Installations, Inc.*, the Sixth Circuit held facts could not support a finding of alter ego liability if there was not "an intent to evade" because it was "clearly the focus of the alter ego doctrine*." Trs. of the Resilient Floor Decorators Ins. Fund v. A & M Installations, Inc.*, 395 F.3d 244, 248 (6th Cir. 2005).

207.   *Resilient* held that the absence of some "indication that the relationship between [the companies] has changed over the years or has caused the [union] to receive less than that for which it bargained," there is no inequity that would justify a court's imposition of liability. *Id.* The court concluded "because [there was no] alleg[ation] . . . that [the defendant] concealed its close relationship with [the other company] and because there is no indication that [the union] ha[d] not received the full benefit of its collective bargaining agreement[,] . . . the application of the alter ego doctrine [was] inappropriate . . . ." *Id.*

208.   It appears *Resilient* did not so much make the intent factor more dispositive when a union company follows a non-union company, so much as find the entire application of the alter ego doctrine not appropriate, when a union company follows a non-union company and there is no preexisting labor obligation. The reasoning appears grounded in a concern about whether there is a labor agreement in place when the second company is created, as a negotiating party aware of a double-breasted operation is on notice and can bargain for the prohibition of subcontracting. *See also Mass. Carpenters Cent. Collection Agency v. A.A. Bldg. Erectors, Inc.*, 343 F.3d 18, 22 (1st Cir. 2003).

209. This court has already distinguished *Resilient's* harsh intent holding as inapplicable where a non-union company is formed after a union company that had preexisting obligations under a collective bargaining agreement. *See Trs. of the Painters Union Deposit Fund v. Interior/Exterior Specialists Co.*, No. 05-70110, 2007 U.S. Dist. LEXIS 21597, at *14 (E.D. Mich. Mar. 27, 2007) (Roberts, J.) ("IES and TLG represent the inverse of *Resilient Floor* and *McCarthy*. TLG, a nonunion company, was incorporated in 1999 after IES signed the CBA"); *Cement Masons' Pension Trust-Fund v. McCarthy*, No. 04-74006, 2006 U.S. Dist. LEXIS 17008 (E.D. Mich. Mar. 24, 2006) (citing *Resilient*, 395 F.3d 244).

210. The Sixth Circuit's decision in *Allcoast* preceded *Resilient*, and the Court explicitly held that "a finding of employer intent is not essential or prerequisite to imposition of alter ego status." *Mich. Glass & Glazing Indus. Defined Contribution*, 2008 U.S. Dist. LEXIS 13253, at *30 (citing *Allcoast*, 780 F.2d at 581).

211. *Allcoast* did not so much allow a finding of alter ego status *without* intent, as it held the presence of other factors could *infer intent*. *See Allcoast*, 780 F.2d at 583.

212. However, if a showing can be made that an employer intended to circumvent its labor obligations, it lends considerable support to an alter ego finding. *NLRB v. Crossroads Elec., Inc.*, No. 05-1395, 178 Fed. Appx. 528, 534 (6th Cir. May 5, 2006) (unpublished) (citing *Allcoast*, 780 F.2d at 581); *Fullerton*, 910 F.2d at 337).

213. Because TLG, a non-union company, was formed after IES, a union company, *Resilient's* intent holding cannot directly apply here.

214. The Court may consider the time period covered by the settlement agreement to determine whether IES and TLG are alter egos. *See also Interior/Exterior Specialists*, 2007 U.S. Dist. LEXIS 21597, at *17.

215. IES and TLG have technically distinct owners. This factor initially weighs against a finding of alter ego liability. Nonetheless, in establishing common ownership, ownership by members of the same family may be considered. *See Northwestern Ohio Adm'rs v. S.E.A. Builders Corp.*, No. 99-7406, 2001 U.S. Dist. LEXIS 17930, at *13-15 (N.D. Ohio Oct. 31, 2001) (citing *Pipe Fitters Union Local No. 392 v. Aggressive Piping, Corp.*, 841 F. Supp. 224, 227 (S.D. Ohio 1991)); *Central States Southeast & Southwest Areas Pension Fund*, 902 F.2d 593, 597 (7th Cir. 1990); *Crawford Door Sales*, 226 N.L.R.B. 1144 (1976); *but see Gen. Longshore Workers, Local 1988 v. Pate Stevedore Co.*, No. 91-30292, 1993 U.S. Dist. LEXIS 18638, at *18 (N.D. Fla. Dec. 30, 1993).

216. While there is technically different ownership of IES and TLG, the separate ownership is not as firm as would usually be the case between two distinct companies. This factor only weighs slightly in favor of IES and TLG.

217. While there is technically different management of IES and TLG, these managerial distinctions are not as firm as would usually be the case between two distinct companies. This factor only weighs slightly in favor of IES and TLG.

218. IES and TLG have generally separate business purposes. Nevertheless, their purposes are not mutually exclusive. Their work can overlap, albeit in the separate roles of general contractor or subcontractor. Although TLG's painting work was not a significant portion of its work, IES and TLG both engaged in

painting before their settlement with the union. This factor weighs slightly in favor of IES and TLG. *See also Roofers Local 149 Sec. Trust Fund v. Duane Smelser Roofing Co.*, 285 F. Supp. 2d 936, 941 (E.D. Mich. 2003).

219. IES and TLG generally have different paid supervisors. However, Mr. Llamas' occasional supervision of TLG projects undercuts this factor. This factor weighs slightly in favor of the Trustees.

220. IES and TLG have separate field and office equipment.

221. Aside from work subcontracted from TLG to IES, IES and TLG have some of the same customers. This factor weighs slightly in favor of the Trustees.

222. The operations factor weighs heavily in favor of the Trustees.

223. The Court finds the most analogous case to the facts before it is *Wilson v. Int'l Bhd. of Teamsters*, 83 F.3d 747 (6th Cir. 1996). In *Wilson*, the Sixth Circuit upheld a finding of alter ego liability where the two corporations: (1) shared the same corporate headquarters; (2) exchanged employees; (3) one official periodically represented the other during labor negotiations; and (4) one official supervised the truck drivers hired by the other. *Wilson*, 83 F.3d at 759. Notably, there was no consideration of intent to evade.

224. The relationship between IES and TLG offers the same amount of evidence supporting alter ego liability. IES and TLG share the same office space (although they have separate facilities within it) and they have "exchanged employees;" the same people worked for both to a substantial degree. Thus, the facts meet the first two major points in *Wilson*. Although it is not the case that one official periodically represented the other during labor negotiations or that one official

supervised the truck drivers hired by the other," IES and TLG: (1) have

substantial undocumented/inaccurate inter-company transactions and financial

records; (2) Mr. Llamas can sign checks for TLG, and Ms. Llamas can sign

checks for IES; (3) Mr. Llamas appears on the payroll of TLG and Ms. Llamas

appears on the payroll of IES; (4) Mr. Llamas has sometimes supervised TLG

projects; (5) IES takes care of many of the bills and maintenance for the building

for an arbitrary management fee; (6) Mr. and Ms. Llamas both own the building

that IES and TLG rent; (7) Mr. Llamas occasionally helps unload equipment or

deliveries for TLG; (8) employees from each company sometimes answer the

phone for the other; and (9) there is some limited evidence of intent to evade the

CBA through subcontracting from IES to TLG.

225.    In *Resilient*, the court determined that, even if it were to conclude that the alter

ego doctrine applied when the union company came after the non-union

company, there was no alter ego liability where: (1) the defendants' shared office

and warehouse space, (2) shared equipment and office staff; and (3) one loaned

the other $ 5,000 to post a security bond with the union to fulfill a condition of its

collective bargaining agreement fell "short of the kind of pervasive intermingling

of funds and operations necessary to support a finding that two companies are

alter egos of one another.  *Cement*, 2006 U.S. Dist. LEXIS 17008, at *18-19

(citing *Resilient*, 395 F.3d at 249).

226.    More facts supporting alter ego are present.  IES and TLG: (1) share the same

office space (although they have separate facilities within it); (2) jointly own the

building they use as their office; (3) have a financial relationship analogous to the

"pervasive intermingling of funds" absent in *Resilient*; and (4) shared staff during a significant period of time to a substantial degree.

227.    Although IES and TLG do not share equipment, unlike *Resilient*, there is evidence of intent to evade.  In addition, Mr. and Mrs. Llamas both appeared on the payroll of their spouses' company, and Mr. Llamas supervised TLG employees on a few occasions.

228.    After consideration of Sixth Circuit precedent and all the relevant factors, the Court finds that IES and TLG are alter egos.

229.    The Court **GRANTS** the Trustees' claim for delinquent fringe benefit payments based on an alter ego theory under 29 U.S.C. § 1145.

**B.      Defamation and Preemption**

230.    In this Court's previous order, *Trs. of the Painters Union Deposit Fund v. Interior Exterior/Specialists Co.,* No. 05-70110, 2007 U.S. Dist. LEXIS 21590, at *17-22 (E.D Mich. Mar. 27, 2007) (Roberts, J.), it considered the preemption of IES and TLG's defamation claims under the National Labor Relations Act, 29 U.S.C. § 141, *et seq*, ("NLRA").  The Court held these claims were not precluded under §§ 7 or 8 of the NLRA.  *Id.*; 29 U.S.C. §§ 157-158.

231.    Neither party raised preemption under § 301 of the Labor Management Relations Act in a motion prior to their trial briefs, nor did the Court previously consider preemption under this section.  The Union first raised the issue in its trial brief. Judge Lawson addressed the application of § 301 issue in an order for the previously discussed case against IES and TLG.  Judge Lawson found that the Sixth Circuit held "[t]he Supreme Court . . . require[s] federal pre-emption of state

law-based actions . . . [when those actions are] inextricably intertwined with consideration of the terms of the labor contract.'" *Interior/Exterior Specialist Co. v Local 334 of the Laborers Int'l Union of N. Am.*, No. 06-14154, 2007 WL 851771, at *6 (E.D. Mich. Mar. 21, 2007) (quoting *Mattis v. Massman*, 355 F.3d at 905).

232. Considering IES' defamation claims, Judge Lawson held:

> To determine whether a state-law claim is sufficiently "independent" to survive § 301 preemption, this court has adopted a two-step inquiry. First, courts must determine whether resolving the state-law claim *would require interpretation of the terms of the collective bargaining agreement. If so, the claim is preempted.* Second, courts must ascertain whether the rights claimed by the plaintiff were created by the collective bargaining agreement, or instead by state law. If the rights were created by the collective bargaining agreement, the claim is preempted. In short, if a state-law claim fails *either* of these two requirements, it is preempted by § 301.

*Local 334*, 2007 WL 851771, at *6 (emphasis added and in original) (internal citations omitted) (quoting *Mattis v. Massman*, 355 F.3d at 905).

233. Applying this test to IES' defamation claims, Judge Lawson held:

> A plaintiff bringing a defamation claim [under Michigan law] must plead and prove four elements: "(a) a false and defamatory statement concerning plaintiff; (b) an unprivileged communication to a third party; (c) fault amounting at least to negligence on the part of the publisher; and (d) either actionability of the statement irrespective of special harm (defamation per se) or the existence of special harm caused by the publication (defamation per quod)." The defendant's statements that the plaintiff alleges are defamatory concerned the plaintiff's failure to satisfy its fringe benefit obligations as required by the CBA. The plaintiff must prove that the statements were false, which it proposes to do by showing that it terminated the CBA according to its terms before the 2003-2006 contract went into effect. Plainly, "resolving the state-law claim would require interpretation of the terms of the collective bargaining agreement"; the defamation count consequently is pre-empted by section 301.

*Id.* (quoting *New Franklin Enter. v. Sabo,* 480 N.W.2d 326, 328 (Mich. Ct. App. 1991)).

234. The Union's reliance on Judge Lawson's decision has merit.

235. "[W]hen resolution of a state-law claim is substantially dependent upon analysis of the terms of an agreement made between the parties in a labor contract, that claim must either be treated as a § 301 claim or dismissed as pre-empted by federal labor-contract law." *Allis-Chalmers Corp. v. Lueck*, 471 U.S. 202, 220 (1985) (internal citation omitted) (citing *Avco Corp. v. Aero Lodge 735*, 390 U.S. 557 (1968)).

236. If IES and TLG's defamation claims are preempted by § 301, they must be dismissed, at least, because they did not plead a § 301 claim in their complaint, and their defamation claims were not filed within the six month limitations period.

237. Dismissal for lack of subject matter jurisdiction may occur at any time. *Grupo Dataflux v. Atlas Global Group, L.P.*, 541 U.S. 567, 571 (2004); *see also Doe v. Lexington-Fayette Urban Co. Gov't*, 407 F.3d 755, 761 (6th Cir. 2005).

238. IES' defamation claims do not necessarily require interpretation of the CBA for two reasons: (1) payment of fringe benefits is also mandated by state law as part of the prevailing wage; and (2) in some instances the obligation to pay fringe benefits continues after the termination of a collective bargaining agreement. *See e.g., Dugan v. R.J. Corman R.R. Co.*, 344 F.3d 662, 668-669 (7th Cir. 2003).

239. Thomas' statements at the Patrick Henry School are preempted by section 301.

Thomas referenced IES' obligations to pay fringe benefits to the Union based on a CBA. The only manner IES can challenge the truth of this statement is to argue the CBA terminated and/or interpret the CBA to dispute the terms of any continuing obligation to pay benefits to Fund after termination. IES failed to plead a section 301 claim, and in any event, filed its claim after the expiration of the six month statute of limitations.

240. Thomas' statements at Western Michigan University are preempted under section 301. Thomas clearly referenced IES' obligation to pay fringe benefits to the Union under the CBA when he suggested payment through joint checks issued in the name of IES and the Union's Fund. The only manner IES can challenge the truth of this statement is to argue the CBA terminated and/or interpret the CBA to dispute the terms of any continuing obligation to pay benefits to the Fund after termination. IES failed to plead a section 301 claim, and in any event, filed its claim after the expiration of the six month statute of limitations.

241. Thomas' statements at Wayne State University that TLG did not pay its employees the prevailing wage are not preempted by section 301 because they do not require interpretation of a collective bargaining agreement. TLG was not a signatory to a collective bargaining agreement, and TLG's efforts to prove these statement were false do not require the interpretation of a CBA.

242. In *Garmon*, the Supreme Court held that "when an activity is arguably subject to § 7 or § 8 of the Act, the states as well as the federal courts must defer to the exclusive competence of the National Labor Relations Board if the danger of

38

state interference with national policy is to be averted." *San Diego Bldg. Trades Council v. Garmon*, 359 U.S. 236, 245 (1959).

243. The Supreme Court "limit[ed] the availability of state remedies for libel to those instances in which the complainant can show that the defamatory statements were circulated with malice and caused him damage." *Linn v. United Plant Guard Workers*, 383 U.S. 53, 64-65 (U.S. 1966)

244. "[A]ctual malice" . . . is . . . knowledge that it was false or with reckless disregard of whether it was false or not." *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 280 (1964).

245. Thomas could not have know whether or not his statement about TLG was true.

246. In order to satisfy the reckless disregard test of actual malice, TLG is required to present evidence that the statements were published with a high degree of awareness of probable falsity and that the Union in fact entertained serious doubts as to the truth of the matter published. *Gaynes v. Allen*, 339 N.W.2d 678 (Mich. Ct. App. 1983) (quoting *Garrison v. Louisiana*, 379 U.S. 64 (1964)).

247. "[M]alice must exist at the time of the original libelous publication." *Peisner v. Detroit Free Press, Inc.*, 304 N.W.2d 814, 816 (Mich. Ct. App. 1981); *Sullivan*, 376 U.S. at 286.

248. TLG must prove malice by clear and convincing evidence. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255-256 (1986).

249. Thomas could not have known whether or not TLG was paying "fair wages," in

this case reasonably construed as the prevailing wage, based solely on the fact that TLG was not a union company. However, Thomas had some reasonable grounds to think TLG was not paying the prevailing wage. TLG appeared to be doing work that should have been done by IES. Thomas reasonably held "serious doubts" that TLG *was paying* the prevailing wage. There are not many reasons for IES to subcontract painting to TLG, a non-union company, in violation of the CBA, unless TLG was paying less than the prevailing wage IES was obligated to pay. Even if there were reasons, it was reasonable for Thomas to assume TLG was paying less than the prevailing wage.

250. Although Thomas may have been negligent, TLG did not prove, by way of clear and convincing evidence, that he made his statement with malice.

251. Even if IES' claims for defamation were not preempted by section 301 they are preempted under *Garmon*. IES did not prove by clear and convincing evidence that these alleged defamatory statements were made with malice.

252. IES and TLG's counterclaims for defamation are **DENIED**.

## C. Restitution

253. After trial, the Trustees advance an argument never mentioned in: (1) their previous motions; (2) the Joint Pretrial Statement; (3) their trial brief; or (4) at trial. Citing Judge Lawson's decision in *Laborers Pension Trust Fund - Detroit & Vicinity v. Interior Exterior Specialists Constr. Group, Inc.*, 479 F. Supp. 2d 674 (E.D. Mich. 2007), also a case against IES, the Trustees argue IES' counterclaim

for restitution is barred by section 515 of ERISA. 29 U.S.C. § 1145.

254.   Section 515, titled "Delinquent contributions," states:

> Every employer who is obligated to make contributions to a
> multiemployer plan under the terms of the plan or under the terms of
> a collectively bargained agreement shall, to the extent not inconsistent
> with law, make such contributions in accordance with the terms and
> conditions of such plan or such agreement.

29 U.S.C. § 1145.

255.   The Trustees argue IES' "defense" to its action under section 515 is unavailable
under Sixth Circuit precedent because the claim cannot be resolved by the
"cursory review" required by section 515. *See Plumbers & Pipefitters Local
Union No. 572 Health & Welfare Fund v. A & H Mech. Contrs.*, No. 02- 6131, 100
Fed. Appx. 396, 402 (6th Cir. June 1, 2004) (unpublished) (citing *La. Bricklayers
& Trowel Trades Pension Fund & Welfare Fund v. Alfred Miller Gen. Masonry
Contracting Co.*, 157 F.3d 404, 408 (5th Cir. 1998)); *see also Trs. of the B.A.C.
Local 32 Ins. Fund v. Norwest Tile Co.*, No. 042436, 2005 U.S. App. LEXIS
27879, at *13-17 (6th Cir. Dec. 14, 2005) (unpublished).

256.   The Trustees' argument is misplaced. IES' action is not a defense to a payment
of delinquent benefits, but a *counterclaim* for an *overpayment* of previously paid
benefits. IES does not bring its counterclaim for restitution pursuant to section
515. Instead, in the Sixth Circuit, IES' counterclaim for restitution arises from
federal common law. *See Whitworth Bros. Storage Co. v. Central States,*

41

*Southeast & Southwest Areas Pension Fund (Whitworth I)*, 794 F.2d 221 (6th Cir. 1986); *Whitworth Bros. Storage Co. v. Cent. States, Southeast & Southwest Areas Pension Fund (Whitworth II)*, 982 F.2d 1006 (6th Cir. 1993). Despite the use of eight pages of its amended proposed findings of fact and conclusions of law to advance the point, the Trustees' argument that section 515 bars this court from considering IES' claim for restitution is without merit.

257. Even if the section 515 analysis was relevant to an action attempting to recoup a previous overpayment, the Trustees' argument is also waived because it was not raised until after trial. The Court has jurisdiction under federal common law to hear an action for restitution of fund overpayments. *Whitworth I*, 794 F.2d at 236. The Trustees' argument cannot be properly characterized as a jurisdictional argument that can be raised at any time. *Grupo*, 541 U.S. at 571; *see also Lexington-Fayette*, 407 F.3d at 761.

258. Thus, the Trustees' section 515 argument is otherwise waived because it is properly characterized as an argument that IES failed to state a claim, and the Trustees failed to raise the issue before the conclusion of trial. *See Ausel v. Unisys Corp.*, No. 96-2062, 1997 U.S. App. LEXIS 32771, at *6 (6th Cir. Nov. 13, 1997) (unpublished) (citing FED. R. CIV. P. 12(h)(2)) ("[A] motion to dismiss for failure to state a claim under Rule 12(b)(6) may be timely made *as late as trial.*") (emphasis added).

259. ERISA permits the refund of overpayments to employers when a defendant brings a claim for overpayment based on mistake of law or fact. 29 U.S.C. § 1103(c)(2)(A)(ii); *Whitworth II*, 982 F.2d at 1011. "The Act itself does not define

such mistakes," but it is clear that Mr. Llamas did not make a "mistake" of fact or law when he made these payments. *Cent. States v. Wholesale Produce Supply Co.*, 478 F. Supp. 884, 887 (D. Minn. 1979); *see also Crews v. Cent. States, Southeast & Southwest Areas Pension Fund*, 788 F.2d 332, 337 (6th Cir. 1986).

260.   A "mistake" is "some unintentional act, omission, or error arising from ignorance, surprise, imposition, or misplaced confidence. A mistake exists when a person under some erroneous conviction of law or fact, does, or omits to do, some act which *but for the erroneous conviction*, he would not have done or omitted." Black's Law Dictionary 903 (5th ed. 1979) (emphasis added).

261.   Mr. Llamas claimed at trial that he did not believe IES was bound by the CBA. at the time he agreed to make the payments. Mr. Llamas did not argue he believed IES was obligated by law to make the payments it now seeks to recover. Despite the availability of a claim under federal common law for restitution of ERISA overpayments, trial made clear that Mr. Llamas paid these benefits on behalf of IES under protest, not because of a "mistake" of fact or law.

262.   Even if IES did make an overpayment based on a mistake of fact or law, the record does not show it ever made a formal request for a refund to the fund prior to filing its counterclaim. As a result, IES' claim for restitution also fails for failure to exhaust administrative remedies. *See Whitworth (II)*, 982 F.2d at 1019.

263.   IES' counterclaim for restitution is **DENIED**.

## D.   Racial Discrimination

264.   TLG does not have a claim in its complaint under 42 U.S.C. § 1981. The Union was entitled to raise the failure to state a claim at any point before the conclusion

of trial, which it did. FED. R. CIV. P. 12(b)(6).

265. The protections of § 1981 extend to "the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." 42 U.S.C. § 1981(b).

266. Section 1981 covers claims for discrimination based on Hispanic racial identity, ethnicity, or ancestry. *See Saint Francis Coll. v. Al-Khazraji*, 481 U.S. 604 (1987); *Erebia v. Chrysler Plastic Prod. Corp.*, 772 F.2d 1250, 1253 (6th Cir. 1985).

267. This claim is appropriately framed as the disparate treatment of IES compared to other union CBA signatories and/or former signatories, based on the racial identity of IES and/or its willingness to hire persons of Hispanic origin.

268. IES may bring a claim as a corporation under § 1981 because it is Hispanic owned and controlled. *See Florence Urgent Care v. HealthSpan, Inc.*, 445 F. Supp. 2d 871, 877 (S.D. Ohio 2006). It may also assert a claim of retaliatory discrimination if adverse actions are taken against it because it hires Hispanic employees. *See Airbrush Express, Inc. v. Jefferson Mall Co., L.P.*, No. 03-691, 2005 U.S. Dist. LEXIS 44785, at *13 (W.D. Ky. June 30, 2005).

269. It is not clear that Sixth Circuit precedent protects against private discrimination because of alienage under § 1981. *See Camara v. Schwan's Food Mfg.*, No. 04-121, 2005 U.S. Dist. LEXIS 44783, *15-16 (E.D. Ky. Aug. 15, 2005). In any event, IES' complaint does not mention alienage discrimination, and so discrimination against non-citizens because of their status is not at issue.

270. The failure to provide the UAP in languages other than English is not standing

alone, circumstantial evidence of racial discrimination.  Unlike Title VII, 42 U.S.C. § 1981 does not support claims of disparate impact.  The fact that non-English speaking persons have to pay for an English-only apprentice program in which they cannot participate, while perhaps unfair and unreasonable, is evidence of language discrimination (against all non-English speakers), not race discrimination.

271.  The Court is aware of the holding of the Supreme Court that "[i]t may well be, for certain ethnic groups and in some communities, that proficiency in a particular language, like skin color, [could] be treated as a surrogate for race under an equal protection analysis." *Hernandez v. New York*, 500 U.S. 352, 371 (1991).  It is also aware of the equal protection holding in *Olagues v. Russoniello*, 797 F.2d 1511, 1521 (9th Cir. 1986), which suggests the targeting of only Spanish-speakers could serve as a proxy for race (albeit in combination with additional characteristics).  However, IES does not cite to either of these cases, or a single case within the Sixth Circuit permitting the use of language as a proxy for race under § 1981, such that the Court could hold that the provision of educational materials in only Spanish could constitute evidence of disparate treatment based on race.  For the Court to advance into this new terrain would have required a more pointed argument, and indeed, additional information on the characteristics and language abilities of the employees of IES.

272.  In order to prove its claim IES must establish: (1) membership in a racial minority; (2) that the Union intended to discriminate on the basis of race; and (3) discrimination concerning one of the activities enumerated in § 1981.  *Mitchell v.*

45

*Toledo Hosp.* 964 F.2d 577, 582 (6th Cir. 1992).

273. The Court applies the traditional *McDonnell Douglass* analysis to claims of racial discrimination under § 1981. *See Burks v. Yellow Transp., Inc.*, No. 07-3201, 2008 U.S. App. LEXIS 518, at *14 n.4 (6th Cir. Jan. 8, 2008) (unpublished) (citing *Noble v. Brinker Int'l, Inc.*, 391 F.3d 715, 720 (6th Cir. 2004)).

274. "A plaintiff may establish a claim of discrimination either by introducing direct evidence of discrimination, or by proving circumstantial evidence which would support an inference of discrimination." *Johnson v. Univ. of Cincinnati,* 215 F.3d 561, 572 (6th Cir. 2000)

275. IES does not offer direct evidence of discrimination. *See Jacklyn v. Schering Plough Healthcare Prods. Sales Corp.,* 176 F.3d 921, 926 (6th Cir. 1999).

276. To prevail on a claim of race discrimination under § 1981 based on circumstantial evidence, a plaintiff must meet the tripartite standard of proof for Title VII cases established by the Supreme Court in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973). *Texas Dep't of Cmty. Affairs v. Burdine,* 450 U.S. 248 (1981); *Jackson v. Quanex Corp.,* 191 F.3d 647, 658 (6th Cir. 1999); *Mitchell v. Toledo Hosp.,* 964 F.2d 577, 582 (6th Cir. 1992).

277. "The proof required to make the prima facie case required by the *McDonnell Douglas* burden shifting analysis varies depending on the claims and facts asserted." *Mitchell v. Toledo Hosp.* 964 F.2d 577, 582 (6th Cir. 1992).

278. IES' precise allegation of differential treatment by the Union does not fit comfortably within traditional prima facie structures.

279. However, the Court finds the best formulation is to require IES to establish a

prima facie case by showing that: (1) it is a member of a protected class; (2) it sought to make, enforce, or terminate a contract in a manner generally engaged in by painting companies in relation to unions; and (3) the Union treated it different from similarly-situated "non-Hispanic corporations" outside the protected class. *See Florence Urgent Care v. HealthSpan, Inc.*, 445 F. Supp. 2d 871, 877 (S.D. Ohio 2006).

280. IES establishes a prima facie case of discrimination through circumstantial evidence.

281. There is some circumstantial evidence that IES, a Hispanic-owned and controlled company, was treated differently than non-Hispanic companies while it was participating in the Union pursuant to the terms of the CBA.

282.  There is some circumstantial evidence that IES, a Hispanic-owned and controlled company, was treated differently than non-Hispanic companies when it attempted to terminate its contract.

283. IES attempted to withdraw from the CBA with timely notice to the Union.  IES did so in accordance with the CBA.  IES attempted to exercise this contractual right in a manner generally engaged (in fact necessarily engaged in according to the CBA) by painting companies in relation to unions.  However, it was met with strong resistance.

284. As a result, the burden of production shifts to the Union to articulate some legitimate, nondiscriminatory reason(s) for the adverse actions.  *See id.*; *cf. EEOC v. Avery Dennison Corp.*, 104 F.3d 858, 862 (6th Cir. 1997) (quoting *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 252 (1981)).

47

285. Because the Union in fact meets this burden by stating it treated IES differently because of Kennedy's anger, and pursuant to legitimate union organizing and CBA enforcement activities, the burden shifts back to IES to show that the Union's stated reasons for its adverse actions were in fact a pretext. In order to prove pretext "the plaintiff may not rely simply upon his prima facie evidence but must, instead, introduce additional evidence of discrimination." *Manzer v. Diamond Shamrock Chems. Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994)

286. IES must show by a preponderance of the evidence either (1) that the proffered reasons had no basis *in fact*, (2) that the proffered reasons did not *actually* motivate the [the Union's] actions, or (3) that they were *insufficient* to motivate the Union's actions. *Id.* (emphasis in original).

287. IES did not substantively argue the first prong.

288. IES' argument fails under the second prong because it has not put forward evidence of pretext such that "the sheer weight of the circumstantial evidence of discrimination makes it 'more likely than not' that the employer's explanation is a pretext, or coverup" or that "the strength of his circumstantial evidence . . . overwhelms [the Union's] non-discriminatory reasons." *Id.* at 1084.

289. The third prong may be met by evidence that other Painting companies, not in the protected class of Hispanic-owned companies, were treated differently even though they engaged in substantially identical conduct to that which the Union contends motivated its adverse actions. *Id.*

290. However, IES has not offered evidence of similarly situated companies

48

either in regard to the enforcement or termination of its contract: (1) the work of the additional Madias companies was covered by an agreement with a union (albeit not the Painters Union); (2) the Lancaster Company never became an active painting company; (3) an alter ego charge was not lodged with the NLRB against any of the companies; (4) the Duross companies never withdrew from the Union; (5) none of these companies settled an alter ego claim against them and then withdrew from the Union; and (6) Forrest Painting is non-union.

291. Kennedy testified he needed evidence such as pay stubs to request a full audit of a painting company. Mr. Llamas did not provide the Union with documentary evidence of his claims since the time he was a journeyman painter before he owned IES.

292. A motivating factor of the Union's response was the Hispanic identity of IES. However, the Court finds the Union would have still responded in the same manner, even if IES did not have a Hispanic identity because: a formal NLRB charge had been made against IES by a painting employee; (2) the Union had entered into a settlement to resolve this charge under the assumption IES would remain in the Union; (3) IES' withdrew from the Union; (4) this withdrawal angered Kennedy for a variety of reasons; (5) the Union does not aggressively enforce its own CBA without the filing of a formal complaint by a Union member.

293. The fact that the Union would have taken the same action precludes liability under 42 U.S.C. § 1981. *See Carey v. Fedex Ground Package Sys., Inc.*, 321 F.

Supp. 2d 902, 915-918 (S.D. Ohio 2004).

294. The Court **DENIES** IES' crossclaim for racial discrimination under § 1981.

## E. Damages

295. Mr. Llamas, IES, and TLG are jointly and severally liable for delinquent fringe benefits of $155,651.35 and liquidated damages of $31,130.27 under the Trustees' alter ego claim.

## IV. CONCLUSION

296. The Court **GRANTS** The Trustees' claim for unpaid fringe benefits under an alter ego theory.  The Trustees are entitled to $186,781.62 in unpaid fringe benefits. The Court **DENIES** IES' counterclaim for restitution, and IES and TLG's crossclaims for defamation and racial discrimination.

**IT IS ORDERED**.

<u>**s/Victoria A. Roberts**</u>
**Victoria A. Roberts**
**United States District Judge**

Dated:  March 18, 2008

The undersigned certifies that a copy of this document was served on the attorneys of record by electronic means or U.S. Mail on March 18, 2008.

s/Linda Vertriest
Deputy Clerk